# UNITED STATES TRUST COMPANY OF NEW YORK, TRUSTEE *v.* NEW JERSEY ET AL.

No. 75–1687.   Argued November 10, 1976—Decided April 27, 1977

1

*Devereux Milburn* argued the cause for appellant. With him on the briefs were *Robert A. McTamaney* and *Robert B. Meyner.*

*William F. Hyland,* Attorney General of New Jersey, *pro se,* argued the cause for appellees. With him on the brief were *Michael I. Sovern* and *Murray J. Laulicht.**

*\*Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Daniel M. Cohen,* Assistant Attorney General, filed a brief for the State of New York as *amicus curiae* urging affirmance.

Mr. Justice Blackmun delivered the opinion of the Court.

This case presents a challenge to a New Jersey statute, 1974 N. J. Laws, c. 25, as violative of the Contract Clause [1] of the United States Constitution. That statute, together with a concurrent and parallel New York statute, 1974 N. Y. Laws, c. 993, repealed a statutory covenant made by the two States in 1962 that had limited the ability of The Port Authority of New York and New Jersey [2] to subsidize rail passenger transportation from revenues and reserves.

The suit, one for declaratory relief, was instituted by appellant United States Trust Company of New York in the Superior Court of New Jersey, Law Division, Bergen County. Named as defendants were the State of New Jersey, its Governor, and its Attorney General. Plaintiff-appellant sued as trustee for two series of Port Authority Consolidated Bonds, as a holder of Port Authority Consolidated Bonds, and on behalf of all holders of such bonds.[3]

After a trial, the Superior Court ruled that the statutory repeal was a reasonable exercise of New Jersey's police power, and declared that it was not prohibited by the Contract Clause or by its counterpart in the New Jersey Constitution, Art. IV, § 7, ¶ 3. Accordingly, appellant's complaint was dismissed. 134 N. J. Super. 124, 338 A. 2d 833 (1975). The Supreme Court of New Jersey, on direct appeal and by *per*

---

[1] "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U. S. Const., Art. I, § 10, cl. 1.

[2] The name originally was "The Port of New York Authority." 1921 N. J. Laws, c. 151, p. 416; 1921 N. Y. Laws, c. 154, p. 496. It was changed to "The Port Authority of New York and New Jersey," effective July 1, 1972. 1972 N. J. Laws, c. 69; 1972 N. Y. Laws, c. 531.

[3] Appellant is trustee for the Fortieth and Forty-first Series of Port Authority Consolidated Bonds, with an aggregate principal amount of $200 million. At the time the complaint was filed, appellant also held approximately $96 million of Consolidated Bonds in its own account, as custodian, and as fiduciary in several capacities. There were then over $1,600 million of Consolidated Bonds outstanding.

*curiam* opinion, affirmed "substantially for the reasons set forth in the [trial court's] opinion." 69 N. J. 253, 256, 353 A. 2d 514, 515 (1976). We noted probable jurisdiction. 427 U. S. 903 (1976).[4]

# I

## BACKGROUND

A. *Establishment of the Port Authority.* The Port Authority was established in 1921 by a bistate compact to effectuate "a better co-ordination of the terminal, transportation and other facilities of commerce in, about and through the port of New York." 1921 N. J. Laws, c. 151, p. 413; 1921 N. Y. Laws, c. 154, p. 493. See N. J. Stat. Ann. § 32:1–1 *et seq.* (1940); N. Y. Unconsol. Laws § 6401 *et seq.* (McKinney 1961). The compact, as the Constitution requires, Art. I, § 10, cl. 3, received congressional consent. 42 Stat. 174.

The compact granted the Port Authority enumerated powers and, by its Art. III, "such other and additional powers as shall be conferred upon it by the Legislature of either State concurred in by the Legislature of the other, or by Act or Acts of Congress." The powers are enumerated in Art. VI. Among them is "full power and authority to purchase, construct, lease and/or operate any terminal or transportation facility within said district." "Transportation facility" is defined, in Art. XXII, to include "railroads, steam or electric, . . . for use for the transportation or carriage of persons or property."

The Port Authority was conceived as a financially independent entity, with funds primarily derived from private investors. The preamble to the compact speaks of the "encouragement of

---

[4] The State of New York is not a party to this case, although its Attorney General has filed a brief as *amicus curiae.* A challenge to the parallel New York statute has been pending in the Supreme Court of New York, County of New York, since 1974. *United States Trust Co. of New York* v. *New York,* No. 09128/74.

the investment of capital," and the Port Authority was given power to mortgage its facilities and to pledge its revenues to secure the payment of bonds issued to private investors.[5]

See generally E. Bard, The Port of New York Authority (1942).

B. *Initial Policy Regarding Mass Transit.* Soon after the Port Authority's inception, the two States, again with the consent of Congress, 42 Stat. 822, agreed upon a comprehensive plan for the entity's development. 1922 N. J. Laws, c. 9; 1922 N. Y. Laws, c. 43. This plan was concerned primarily, if not solely, with transportation of freight by carriers and not with the movement of passengers in the Port Authority district. The plan, however, was not implemented.[6] The New

---

[5] The Port Authority possessed no taxing power and was unable to pledge the credit of either State. The trial court found:

"Under the terms of the Compact the power to levy taxes or to pledge the credit of either state was expressly withheld from the Authority. From its inception, with the exception of monies advanced as loans by the states, the Authority was required to finance its facilities solely with money borrowed from the public and to be repaid out of the revenues derived from its operations. By reason of these financial limitations two concepts initially emerged which have played an important role in the realization of the purposes for which the Authority was created: first, the specific projects undertaken by the Authority should be self-supporting, *i. e.*, the revenues of each should be sufficient to cover its operating expenses and debt service requirements; and second, since the Authority is a public agency over which its creditors have no direct control, the bondholders should be protected by covenants with the Authority and with the states which have ultimate control over its operations." 134 N. J. Super. 124, 139–140, 338 A. 2d 833, 841 (1975).

The two States subsequently took steps to protect the Port Authority's financial integrity. See, for example, the 1925 statutory declarations not to authorize the construction of competitive bridges within the district or to limit the right of the Port Authority to levy such charges and tolls as it deemed necessary to produce revenues to fund its bonds. 1925 N. J. Laws, c. 37, § 5; 1925 N. Y. Laws, c. 210, § 5.

[6] The parties are not in agreement as to the original perception of the compact and the plan. The appellant claims that the Port Authority

Jersey Legislature at that time declared that the plan "does not include the problem of passenger traffic," even though that problem "should be considered in co-operation with the port development commission." 1922 Laws, c. 104. The Port Authority itself recognized the existence of the passenger service problem. 1924 Annual Report 23; 1928 Annual Report 64–66; App. 574a–575a.

In 1927 the New Jersey Legislature, in an Act approved by the Governor, directed the Port Authority to make plans "supplementary to or amendatory of the comprehensive plan . . . as will provide adequate interstate and suburban transportation facilities for passengers." 1927 Laws, c. 277. The New York Legislature followed suit in 1928, but its bill encountered executive veto.[7] The trial court observed that this veto "to all intents and purposes ended any legislative effort to involve the Port Authority in an active role in commuter transit for the next 30 years." 134 N. J. Super., at 149, 338 A. 2d, at 846.

was organized "as a freight coordinating agency," Brief for Appellant 5, whereas the appellees challenge that description and emphasize the presence of a mass transit problem as a factor of profound concern in the Port Authority's development. Brief for Appellees 2–5. The trial court found that neither the commission which recommended the creation of the Port Authority nor the comprehensive plan contemplated responsibility of the agency for passenger transit. 134 N. J. Super., at 134–139, 338 A. 2d, at 838–841.

[7] Governor Alfred E. Smith in his statement in support of his veto said:

"[I]t has been a great disappointment to me to find that the opposition of the railroads has prevented to date the making of real progress in working out the program of freight distribution in the port which always has been the main object and purpose of the Port of New York Authority. I am satisfied that the Port Authority should stick to this program and I am entirely unwilling to give my approval to any measure which at the expense of the solution of the great freight distribution problem will set the Port Authority off on an entirely new line of problem connected with the solution of the suburban passenger problem." App. 573a–574a.

C. *Port Authority Fiscal Policy.* Four bridges for motor vehicles were constructed by the Port Authority. A separate series of revenue bonds was issued for each bridge. Revenue initially was below expectations, but the bridges ultimately accounted for much of the Port Authority's financial strength. The legislatures transferred the operation and revenues of the successful Holland Tunnel to the Port Authority, and this more than made up for the early bridge deficits.

The States in 1931 also enacted statutes creating the general reserve fund of the Port Authority. 1931 N. J. Laws, c. 5; 1931 N. Y. Laws, c. 48. Surplus revenues from all Port Authority facilities were to be pooled in the fund to create an irrevocably pledged reserve equal to one-tenth of the par value of the Port Authority's outstanding bonds. This level was attained 15 years later, in 1946.

In 1952, the Port Authority abandoned the practice of earmarking specific facility revenues as security for bonds of that facility. The Port Authority's Consolidated Bond Resolution established the present method of financing its activities; under this method its bonds are secured by a pledge of the general reserve fund.[8]

---

[8] The appellees state that the creation of the general reserve fund "made the Port Authority's fiscal strength possible." Brief for Appellees 6 n. 7.

The parties, however, are in disagreement as to the actual and proper fiscal policy of the Port Authority. Appellant claims that each facility should have prospects of producing sufficient revenue to support itself. Appellees' position is apparent from their assertion that although the self-supporting-facility concept may have "initially emerged," as the trial court stated, 134 N. J. Super., at 140, 338 A. 2d, at 841, "the concept had no practical significance because it was not attained prior to 1931 and was unnecessary after 1931," with the establishment of the general reserve fund. Brief for Appellees 7.

The trial court observed that upon the adoption of the Consolidated Bonds Resolution in 1952, the self-supporting-facility concept "ceased to have the significance previously attached to it." 134 N. J. Super., at 143, 338 A. 2d, at 843.

D. *Renewed Interest in Mass Transit.* Meanwhile, the two States struggled with the passenger transportation problem. Many studies were made. The situation was recognized as critical, great costs were envisioned, and substantial deficits were predicted for any mass transit operation. The Port Authority itself financed a study conducted by the Metropolitan Rapid Transit Commission which the States had established in 1954.

In 1958, Assembly Bill No. 16 was introduced in the New Jersey Legislature. This would have had the Port Authority take over, improve, and operate interstate rail mass transit between New Jersey and New York. The bill was opposed vigorously by the Port Authority on legal and financial grounds. The Port Authority also retaliated, in a sense, by including a new safeguard in its contracts with bondholders. This prohibited the issuance of any bonds, secured by the general reserve fund, for a new facility unless the Port Authority first certified that the issuance of the bonds would not "materially impair the sound credit standing" of the Port Authority. App. 812a. Bill No. 16 was not passed.

In 1959, the two States, with the consent of Congress, Pub. L. 86–302, 73 Stat. 575, created the New York-New Jersey Transportation Agency to deal "with matters affecting public mass transit within and between the 2 States." 1959 N. J. Laws, c. 13, § 3.1, as amended by c. 24; 1959 N. Y. Laws, c. 420, § 3.1.

Also in 1959, the two States enacted legislation providing that upon either State's election the Port Authority would be authorized to purchase and own railroad passenger cars for the purpose of leasing them to commuter railroads. 1959 N. J. Laws, c. 25; 1959 N. Y. Laws, c. 638. Bonds issued for this purpose would be guaranteed by the electing State. New York so elected, N. Y. Const., Art. X, § 7, effective January 1, 1962, and approximately $100 million of Commuter Car Bonds were issued by the Port Authority to purchase about

500 air-conditioned passenger cars and eight locomotives used on the Penn Central and Long Island Railroads.

E. *The 1962 Statutory Covenant.* In 1960 the takeover of the Hudson & Manhattan Railroad by the Port Authority was proposed. This was a privately owned interstate electric commuter system then linking Manhattan, Newark, and Hoboken through the Hudson tubes. It had been in reorganization for many years, and in 1959 the Bankruptcy Court and the United States District Court had approved a plan that left it with cash sufficient to continue operations for two years but with no funds for capital expenditures. *In re Hudson & Manhattan R. Co.,* 174 F. Supp. 148 (SDNY 1959), aff'd *sub nom. Spitzer* v. *Stichman,* 278 F. 2d 402 (CA2 1960). A special committee of the New Jersey Senate was formed to determine whether the Port Authority was "fulfilling its statutory duties and obligations," App. 605a. The committee concluded that the solution to bondholder concern was "[l]imiting by a constitutionally protected statutory covenant with Port Authority bondholders the extent to which the Port Authority revenues and reserves pledged to such bondholders can in the future be applied to the deficits of possible future Port Authority passenger railroad facilities beyond the original Hudson & Manhattan Railroad system." *Id.,* at 656a. And the trial court found that the 1962 New Jersey Legislature "concluded it was necessary to place a limitation on mass transit deficit operations to be undertaken by the Authority in the future so as to promote continued investor confidence in the Authority." 134 N. J. Super., at 178, 338 A. 2d, at 863–864.

The statutory covenant of 1962 was the result. The covenant itself was part of the bistate legislation authorizing the Port Authority to acquire, construct, and operate the Hudson & Manhattan Railroad and the World Trade Center. The statute in relevant part read:

"The 2 States covenant and agree with each other and

with the holders of any affected bonds, as hereinafter defined, that so long as any of such bonds remain outstanding and unpaid and the holders thereof shall not have given their consent as provided in their contract with the port authority, (a) . . . and (b) neither the States nor the port authority nor any subsidiary corporation incorporated for any of the purposes of this act will apply any of the rentals, tolls, fares, fees, charges, revenues or reserves, which have been or shall be pledged in whole or in part as security for such bonds, for any railroad purposes whatsoever other than permitted purposes hereinafter set forth." 1962 N. J. Laws, c. 8, § 6; 1962 N. Y. Laws, c. 209, § 6.[9]

The "permitted purposes" were defined to include (i) the Hudson & Manhattan as then existing, (ii) railroad freight facilities, (iii) tracks and related facilities on Port Authority vehicular bridges, and (iv) a passenger railroad facility if the Port Authority certified that it was "self-supporting" or, if not, that at the end of the preceding calendar year the general reserve fund contained the prescribed statutory amount, and that all the Port Authority's passenger revenues, including the Hudson & Manhattan, would not produce deficits in excess of "permitted deficits."

A passenger railroad would be deemed "self-supporting" if the amount estimated by the Authority as average annual net income equaled or exceeded the average annual debt service for the following decade. Though the covenant was not explicit on the point, the States, the Port Authority, and its bond counsel have agreed that any state subsidy might be included in the computation of average annual net income of the facility.

---

[9] Not at issue in the instant case is part (a) of § 6 of the statutory covenant (omitted in the quoted material in the text), which promises

"Permitted deficits," the alternative method under permitted purpose (iv), was defined to mean that the annual estimated deficit, including debt service, of the Hudson tubes and any additional non-self-sustaining railroad facility could not exceed one-tenth of the general reserve fund, or 1% of the Port Authority's total bonded debt.

The terms of the covenant were self-evident. Within its conditions the covenant permitted, and perhaps even contemplated, additional Port Authority involvement in deficit rail mass transit as its financial position strengthened, since the limitation of the covenant was linked to, and would expand with, the general reserve fund.

A constitutional attack on the legislation containing the covenant was promptly launched. New Jersey and New York joined in the defense. The attack proved unsuccessful. *Courtesy Sandwich Shop, Inc.* v. *Port of New York Authority,* 12 N. Y. 2d 379, 190 N. E. 2d 402, appeal dismissed, 375 U. S. 78 (1963). See *Kheel* v. *Port of New York Authority,* 331 F. Supp. 118 (SDNY 1971), aff'd, 457 F. 2d 46 (CA2), cert. denied, 409 U. S. 983 (1972).

With the legislation embracing the covenant thus effective, the Port Authority on September 1, 1962, assumed the ownership and operating responsibilities of the Hudson & Manhattan through a wholly owned subsidiary, Port Authority Trans-Hudson Corporation (PATH). Funds necessary for this were realized by the successful sale of bonds to private investors accompanied by the certification required by § 7 of the Consolidated Bond Resolution that the operation would not materially impair the credit standing of the Port Authority, the investment status of the Consolidated Bonds, or the ability of the Port Authority to fulfill its commitments to bondholders. This § 7 certification was based on a projection

---

that the States will not impair the Port Authority's control over its fees or services. This provision has not been repealed, even prospectively.

that the annual net loss of the PATH system would level off at about $6.6 million from 1969 to 1991. At the time the certification was made the general reserve fund contained $69 million, and thus the projected PATH deficit was close to the level of "permitted deficits" under the 1962 covenant. 134 N. J. Super., at 163, and n. 27, 338 A. 2d, at 855, and n. 27.

The PATH fare in 1962 was 30 cents and has remained at that figure despite recommendations for increase. App. 684a–686a. As a result of the continuation of the low fare, PATH deficits have far exceeded the initial projection. Thus, although the general reserve fund had grown to $173 million by 1973, substantially increasing the level of permitted deficits to about $17 million, the PATH deficit had grown to $24.9 million. In accordance with a stipulation of the parties, *id.*, at 682a–683a, the trial court found that the PATH deficit so exceeded the covenant's level of permitted deficits that the Port Authority was unable to issue bonds for any new passenger railroad facility that was not self-supporting. 134 N. J. Super., at 163 n. 26, 338 A. 2d, at 855 n. 26.[10]

F. *Prospective Repeal of the Covenant.* Governor Cahill of New Jersey and Governor Rockefeller of New York in April 1970 jointly sought increased Port Authority participation in mass transit. In November 1972 they agreed upon a

---

[10] Notwithstanding the "permitted deficits" formula, the covenant permits use of Port Authority revenues for mass transit if 60% of the bondholders give their consent. The procedures for obtaining such consent are provided in § 16 (b) of the Consolidated Bond Resolution. App. 802a–809a. The Port Authority commissioned a study by First Boston Corporation in 1971 that proposed placing a surcharge on bridge and tunnel tolls, with the extra revenues going to a special fund to secure bonds for mass transportation projects. This proposal would not have diminished the historic reserves pledged to secure the bonds. The study concluded, however, that some increase in the interest rates of existing bonds would have been necessary to obtain a favorable vote of the bondholders. *Id.*, at 696a–699a. There is some evidence in the record that such a proposal could not win bondholder approval, partly because the requisite procedures are unwieldy. *Id.*, at 191a–192a.

plan for expansion of the PATH system. This included the initiation of direct rail service to Kennedy Airport and the construction of a line to Plainfield, N. J., by way of Newark Airport. The plan anticipated a Port Authority investment of something less than $300 million out of a projected total cost of $650 million, with the difference to be supplied by federal and state grants. It also proposed to make the covenant inapplicable with respect to bonds issued *after* the legislation went into effect. This program was enacted, effective May 10, 1973, and the 1962 covenant was thereby rendered inapplicable, or in effect repealed, with respect to bonds issued subsequent to the effective date of the new legislation. 1972 N. J. Laws, c. 208; 1972 N. Y. Laws, c. 1003, as amended by 1973 N. Y. Laws, c. 318.[11]

G. *Retroactive Repeal of the Covenant.* It soon developed that the proposed PATH expansion would not take place as contemplated in the Governors' 1972 plan. New Jersey was unwilling to increase its financial commitment in response to a sharp increase in the projected cost of constructing the Plainfield extension. As a result the anticipated federal grant was not approved. App. 717a.

New Jersey had previously prevented outright repeal of the 1962 covenant, but its attitude changed with the election of a new Governor in 1973. In early 1974, when bills were pending in the two States' legislatures to repeal the covenant

---

[11] The introductory statement appended to the New Jersey bill recited:

"The bill is also designed to preclude the application of the 1962 covenant to holders of bonds newly issued after the effective date of this act, while maintaining in status quo the rights of the holders of the bonds issued after March 27, 1962 (the effective date of the 1962 covenant legislation) but prior to the effective date of this act." *Id.,* at 707a.

Earlier in 1972 the New York Legislature had enacted, and the Governor had signed, a bill repealing the 1962 covenant in its entirety. 1972 N. Y. Laws, c. 1003. New Jersey did not adopt the necessary complementary legislation at that time. The 1973 amendment to the New York legislation, noted in the text, was then enacted to conform to the New Jersey statute.

retroactively, a national energy crisis was developing. On November 27, 1973, Congress had enacted the Emergency Petroleum Allocation Act, 87 Stat. 627, as amended, 15 U. S. C. § 751 *et seq.* (1970 ed., Supp. V). In that Act Congress found that the hardships caused by the oil shortage "jeopardize the normal flow of commerce and constitute a national energy crisis which is a threat to the public health, safety, and welfare." 87 Stat. 628, 15 U. S. C. § 751 (a)(3). This time, proposals for retroactive repeal of the 1962 covenant were passed by the legislature and signed by the Governor of each State. 1974 N. J. Laws, c. 25; 1974 N. Y. Laws, c. 993.[12]

On April 10, 1975, the Port Authority announced an increase in its basic bridge and tunnel tolls designed to raise an estimated $40 million annually. App. 405a–407a, 419a–421a, 528a. This went into effect May 5 and was, it was said, "[t]o increase [the Port Authority's] ability to finance vital mass transit improvements." *Id.,* at 405a.

## II

At the time the Constitution was adopted, and for nearly a century thereafter, the Contract Clause was one of the few express limitations on state power. The many decisions of

---

[12] Governor Wilson of New York, upon signing that State's repealer, observed:

"It is with great reluctance that I approve a bill that overturns a solemn pledge of the State. I take this extraordinary step only because it will lead to an end of the existing controversy over the validity of the statutory covenant, a controversy that can only have an adverse affect [*sic*] upon the administration and financing of the Port Authority, and because it will lead to a speedy resolution by the courts of the questions and issues concerning the validity of the statutory covenant. Because it is the province of the courts to decide questions of constitutionality, I will not prevent the covenant issue from being brought before them, especially where it is the unanimously expressed desire of the members of both houses of the New York State Legislature as well as the expressed will of the Governor and both houses of the Legislature of the State of New Jersey to do so." App. 774a.

this Court involving the Contract Clause are evidence of its important place in our constitutional jurisprudence. Over the last century, however, the Fourteenth Amendment has assumed a far larger place in constitutional adjudication concerning the States. We feel that the present role of the Contract Clause is largely illuminated by two of this Court's decisions. In each, legislation was sustained despite a claim that it had impaired the obligations of contracts.

*Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398 (1934), is regarded as the leading case in the modern era of Contract Clause interpretation. At issue was the Minnesota Mortgage Moratorium Law, enacted in 1933, during the depth of the Depression and when that State was under severe economic stress, and appeared to have no effective alternative. The statute was a temporary measure that allowed judicial extension of the time for redemption; a mortgagor who remained in possession during the extension period was required to pay a reasonable income or rental value to the mortgagee. A closely divided Court, in an opinion by Mr. Chief Justice Hughes, observed that "emergency may furnish the occasion for the exercise of power" and that the "constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions." *Id.,* at 426. It noted that the debates in the Constitutional Convention were of little aid in the construction of the Contract Clause, but that the general purpose of the Clause was clear: to encourage trade and credit by promoting confidence in the stability of contractual obligations. *Id.,* at 427–428. Nevertheless, a State "continues to possess authority to safeguard the vital interests of its people. . . . This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court." *Id.,* at 434–435. The great clauses of the Constitution are to be considered in the

light of our whole experience, and not merely as they would be interpreted by its Framers in the conditions and with the outlook of their time. *Id.*, at 443.

This Court's most recent Contract Clause decision is *El Paso* v. *Simmons,* 379 U. S. 497 (1965). That case concerned a 1941 Texas statute that limited to a 5-year period the reinstatement rights of an interest-defaulting purchaser of land from the State. For many years prior to the enactment of that statute, such a defaulting purchaser, under Texas law, could have reinstated his claim to the land upon written request and payment of delinquent interest, unless rights of third parties had intervened. This Court held that "it is not every modification of a contractual promise that impairs the obligation of contract under federal law." *Id.*, at 506–507. It observed that the State "has the 'sovereign right . . . to protect the . . . general welfare of the people' " and " 'we must respect the "wide discretion on the part of the legislature in determining what is and what is not necessary," ' " *id.*, at 508–509, quoting *East New York Savings Bank* v. *Hahn,* 326 U. S. 230, 232–233 (1945). The Court recognized that "the power of a State to modify or affect the obligation of contract is not without limit," but held that "the objects of the Texas statute make abundantly clear that it impairs no protected right under the Contract Clause." 379 U. S., at 509.

Both of these cases eschewed a rigid application of the Contract Clause to invalidate state legislation. Yet neither indicated that the Contract Clause was without meaning in modern constitutional jurisprudence, or that its limitation on state power was illusory. Whether or not the protection of contract rights comports with current views of wise public policy, the Contract Clause remains a part of our written Constitution. We therefore must attempt to apply that constitutional provision to the instant case with due respect for its purpose and the prior decisions of this Court.

## III

We first examine appellant's general claim that repeal of the 1962 covenant impaired the obligation of the States' contract with the bondholders. It long has been established that the Contract Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties. *Fletcher* v. *Peck,* 6 Cranch 87, 137–139 (1810); *Dartmouth College* v. *Woodward,* 4 Wheat. 518 (1819). Yet the Contract Clause does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects.[13] Thus, as a preliminary matter, appellant's claim requires a determination that the repeal has the effect of impairing a contractual obligation.

In this case the obligation was itself created by a statute, the 1962 legislative covenant. It is unnecessary, however, to dwell on the criteria for determining whether state legislation gives rise to a contractual obligation.[14] The trial court

---

[13] The Contract Clause is in the phrase of the Constitution which contains the prohibition against any State's enacting a bill of attainder or *ex post facto* law. Notwithstanding Mr. Chief Justice Marshall's reference to these two other forbidden categories in *Fletcher* v. *Peck,* 6 Cranch, at 138–139, it is clear that they limit the powers of the States only with regard to the imposition of punishment. *Cummings* v. *Missouri,* 4 Wall. 277, 322–326 (1867); *Calder* v. *Bull,* 3 Dall. 386, 390–391 (1798). The Due Process Clause of the Fourteenth Amendment generally does not prohibit retrospective civil legislation, unless the consequences are particularly "harsh and oppressive." *Welch* v. *Henry,* 305 U. S. 134, 147 (1938). See *Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S. 1, 14–20 (1976).

[14] In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State. Compare *Dodge* v. *Board of Education,* 302 U. S. 74, 78–79 (1937), with *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95, 104–105 (1938). In addition, statutes governing the interpretation and enforcement of contracts may be

found, 134 N. J. Super., at 183 n. 38, 338 A. 2d, at 866 n. 38, and appellees do not deny, that the 1962 covenant constituted a contract between the two States and the holders of the Consolidated Bonds issued between 1962 and the 1973 prospective repeal.[15] The intent to make a contract is clear from the statutory language: "The 2 States covenant and agree with each other and with the holders of any affected bonds . . . ." 1962 N. J. Laws, c. 8, § 6; 1962 N. Y. Laws, c. 209, § 6. Moreover, as the chronology set forth above reveals, the purpose of the covenant was to invoke the constitutional protection of the Contract Clause as security against repeal. In return for their promise, the States received the benefit they bargained for: public marketability of Port Authority bonds to finance construction of the World Trade Center and acquisition of the Hudson & Manhattan Railroad. We therefore have no doubt that the 1962 covenant has been properly characterized as a contractual obligation of the two States.

The parties sharply disagree about the value of the 1962

---

regarded as forming part of the obligation of contracts made under their aegis. See n. 17, *infra.* See generally Hale, The Supreme Court and the Contract Clause: II, 57 Harv. L. Rev. 621, 663–670 (1944).

[15] Between the enactment of the 1962 covenant and its retrospective repeal in 1974, the Port Authority issued and sold to the public $1,260 million of Consolidated Bonds. The Fortieth and Forty-first Series, for which appellant is trustee, were issued after the 1973 prospective repeal and prior to the retrospective repeal. The holders of those bonds were not parties to the 1962 covenant, since the States undoubtedly had the power to repeal the covenant prospectively. See *Ogden* v. *Saunders,* 12 Wheat. 213 (1827). The subsequent bondholders arguably are like third-party beneficiaries of the covenant. There is testimony in the record that they were indirectly protected because the bonds outstanding at the time of the prospective repeal (in excess of $1 billion) could not be expected to be retired in the foreseeable future. App. 1105a. We need not decide whether that indirect relationship supports standing to challenge the retroactive repeal, however. Appellant also sued as a holder of Consolidated Bonds (some $72 million) issued between 1962 and 1973. *Id.,* at 56a–57a.

covenant to the bondholders. Appellant claims that after repeal the secondary market for affected bonds became "thin" and the price fell in relation to other formerly comparable bonds. This claim is supported by the trial court's finding that "immediately following repeal and for a number of months thereafter the market price for Port Authority bonds was adversely affected." 134 N. J. Super., at 180, 338 A. 2d, at 865. Appellees respond that the bonds nevertheless retained an "A" rating from the leading evaluating services and that after an initial adverse effect they regained a comparable price position in the market. Findings of the trial court support these claims as well. *Id.*, at 179–182, 338 A. 2d, at 864–866. The fact is that no one can be sure precisely how much financial loss the bondholders suffered. Factors unrelated to repeal may have influenced price. In addition, the market may not have reacted fully, even as yet, to the covenant's repeal, because of the pending litigation and the possibility that the repeal would be nullified by the courts.

In any event, the question of valuation need not be resolved in the instant case because the State has made no effort to compensate the bondholders for any loss sustained by the repeal.[16] As a security provision, the covenant was not superfluous; it limited the Port Authority's deficits and thus protected the general reserve fund from depletion. Nor was the covenant merely modified or replaced by an arguably comparable security provision. Its outright repeal totally eliminated an important security provision and thus impaired the obligation of the States' contract. See *Richmond Mortgage & Loan Corp.* v. *Wachovia Bank & Trust Co.*, 300 U. S. 124, 128–129 (1937).[17]

---

[16] Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid. *Contributors to Pennsylvania Hospital* v. *Philadelphia*, 245 U. S. 20 (1917); see *El Paso* v. *Simmons*, 379 U. S. 497, 533–534 (1965) (Black, J., dissenting).

[17] The obligations of a contract long have been regarded as including not only the express terms but also the contemporaneous state law per-

The trial court recognized that there was an impairment in this case: "To the extent that the repeal of the covenant authorizes the Authority to assume greater deficits for such

---

taining to interpretation and enforcement. "This Court has said that 'the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms.'" *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 429–430 (1934), quoting *Von Hoffman* v. *City of Quincy,* 4 Wall. 535, 550 (1867). See also *Ogden* v. *Saunders,* 12 Wheat., at 259–260, 297–298 (opinions of Washington and Thompson, JJ.). This principle presumes that contracting parties adopt the terms of their bargain in reliance on the law in effect at the time the agreement is reached.

It is not always unconstitutional, however, for changes in statutory remedies to affect pre-existing contracts. During the early years when the Contract Clause was regarded as an absolute bar to any impairment, this result was reached by treating remedies in a manner distinct from substantive contract obligations. Thus, for example, a State could abolish imprisonment for debt because elimination of this remedy did not impair the underlying obligation. *Penniman's Case,* 103 U. S. 714 (1881); *Mason* v. *Haile,* 12 Wheat. 370 (1827); see *Sturges* v. *Crowninshield,* 4 Wheat. 122, 200–201 (1819).

Yet it was also recognized very early that the distinction between remedies and obligations was not absolute. Impairment of a remedy was held to be unconstitutional if it effectively reduced the value of substantive contract rights. *Green* v. *Biddle,* 8 Wheat. 1, 75–76, 84–85 (1823). See also *Bronson* v. *Kinzie,* 1 How. 311, 315–318 (1843); *Von Hoffman* v. *City of Quincy,* 4 Wall., at 552–554. More recent decisions have not relied on the remedy/obligation distinction, primarily because it is now recognized that obligations as well as remedies may be modified without necessarily violating the Contract Clause. *El Paso* v. *Simmons,* 379 U. S., at 506–507, and n. 9; *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S., at 429–435.

Although now largely an outdated formalism, the remedy/obligation distinction may be viewed as approximating the result of a more particularized inquiry into the legitimate expectations of the contracting parties. The parties may rely on the continued existence of adequate statutory remedies for enforcing their agreement, but they are unlikely to expect that state law will remain entirely static. Thus, a reasonable modification of statutes governing contract remedies is much less likely to upset

purposes, it permits a diminution of the pledged revenues and reserves and may be said to constitute an impairment of the states' contract with the bondholders." 134 N. J. Super., at 183, 338 A. 2d, at 866.

Having thus established that the repeal impaired a contractual obligation of the States, we turn to the question whether that impairment violated the Contract Clause.

## IV

Although the Contract Clause appears literally to proscribe "any" impairment, this Court observed in *Blaisdell* that "the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." 290 U. S., at 428. Thus, a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution. In the instant case, as in *Blaisdell*, we must attempt to reconcile the strictures of the Contract Clause with the "essential attributes of sovereign power," *id.,* at 435, necessarily reserved by the States to safeguard the welfare of their citizens. *Id.,* at 434–440.

The trial court concluded that repeal of the 1962 covenant was a valid exercise of New Jersey's police power because repeal served important public interests in mass transportation, energy conservation, and environmental protection. 134 N. J. Super., at 194–195, 338 A. 2d, at 873. Yet the Contract Clause limits otherwise legitimate exercises of state legislative authority, and the existence of an important public interest is not always sufficient to overcome that limitation. "Undoubtedly, whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power." *Blaisdell,* 290 U. S., at 439. Moreover, the

expectations than a law adjusting the express terms of an agreement. In this respect, the repeal of the 1962 covenant is to be seen as a serious disruption of the bondholders' expectations.

scope of the State's reserved power depends on the nature of the contractual relationship with which the challenged law conflicts.

The States must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result. Otherwise, one would be able to obtain immunity from state regulation by making private contractual arrangements. This principle is summarized in Mr. Justice Holmes' well-known dictum: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson Water Co.* v. *McCarter*, 209 U. S. 349, 357 (1908).[18]

Yet private contracts are not subject to unlimited modification under the police power. The Court in *Blaisdell* recognized that laws intended to regulate existing contractual relationships must serve a legitimate public purpose. 290 U. S., at 444–445. A State could not "adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them." *Id.*, at 439. Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption. *Id.*, at 445–447.[19] As is customary in reviewing economic and social

---

[18] Accord: *Stephenson* v. *Binford*, 287 U. S. 251, 276 (1932); *Manigault* v. *Springs*, 199 U. S. 473, 480 (1905). See *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S., at 437–438.

[19] *Blaisdell* suggested further limitations that have since been subsumed in the overall determination of reasonableness. The legislation sustained in *Blaisdell* was adopted pursuant to a declared emergency in the State and strictly limited in duration. Subsequent decisions struck down state laws that were not so limited. *W. B. Worthen Co.* v. *Thomas*, 292 U. S. 426, 432–434 (1934) (relief not limited as to "time, amount, circumstances, or need"); *Treigle* v. *Acme Homestead Assn.*, 297 U. S. 189, 195 (1936) (no emergency or temporary measure). Later decisions abandoned these limitations as absolute requirements. *Veix* v. *Sixth Ward Building &*

regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure. *East New York Savings Bank* v. *Hahn*, 326 U. S. 230 (1945).

When a State impairs the obligation of its own contract, the reserved-powers doctrine has a different basis. The initial inquiry concerns the ability of the State to enter into an agreement that limits its power to act in the future. As early as *Fletcher* v. *Peck*, the Court considered the argument that "one legislature cannot abridge the powers of a succeeding legislature." 6 Cranch, at 135. It is often stated that "the legislature cannot bargain away the police power of a State." *Stone* v. *Mississippi*, 101 U. S. 814, 817 (1880).[20] This doctrine requires a determination of the State's power to create irrevocable contract rights in the first place, rather than an inquiry into the purpose or reasonableness of the subsequent impairment. In short, the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty.

In deciding whether a State's contract was invalid *ab initio* under the reserved-powers doctrine, earlier decisions relied on distinctions among the various powers of the State. Thus, the

---

*Loan Assn.*, 310 U. S., 32, 39–40 (1940) (emergency need not be declared and relief measure need not be temporary); *East New York Savings Bank* v. *Hahn*, 326 U. S. 230 (1945) (approving 10th extension of one-year mortgage moratorium). Undoubtedly the existence of an emergency and the limited duration of a relief measure are factors to be assessed in determining the reasonableness of an impairment, but they cannot be regarded as essential in every case.

[20] *Stone* v. *Mississippi* sustained the State's revocation of a 25-year charter to operate a lottery. Other cases similarly have held that a State is without power to enter into binding contracts not to exercise its police power in the future. *E. g.*, *Pierce Oil Corp.* v. *City of Hope*, 248 U. S. 498, 501 (1919); *Atlantic Coast Line R. Co.* v. *Goldsboro*, 232 U. S. 548, 558 (1914); *Douglas* v. *Kentucky*, 168 U. S. 488, 502–505 (1897). See *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S., at 436–437.

police power and the power of eminent domain were among those that could not be "contracted away," but the State could bind itself in the future exercise of the taxing and spending powers.[21] Such formalistic distinctions perhaps cannot be dispositive, but they contain an important element of truth. Whatever the propriety of a State's binding itself to a future course of conduct in other contexts, the power to enter into effective financial contracts cannot be questioned. Any financial obligation could be regarded in theory as a relinquishment of the State's spending power, since money spent to repay debts is not available for other purposes. Similarly, the taxing power may have to be exercised if debts are to be repaid. Notwithstanding these effects, the Court has regularly held that the States are bound by their debt contracts.[22]

The instant case involves a financial obligation and thus as a threshold matter may not be said automatically to fall

---

[21] In *New Jersey* v. *Wilson,* 7 Cranch 164 (1812), the Court held that a State could properly grant a permanent tax exemption and that the Contract Clause prohibited any impairment of such an agreement. This holding has never been repudiated, although tax exemption contracts generally have not received a sympathetic construction. See B. Wright, The Contract Clause of the Constitution 179–194 (1938).

By contrast, the doctrine that a State cannot contract away the power of eminent domain has been established since *West River Bridge Co.* v. *Dix,* 6 How. 507 (1848). See *Contributors to Pennsylvania Hospital* v. *Philadelphia,* 245 U. S., at 23–24. The doctrine that a State cannot be bound to a contract forbidding the exercise of its police power is almost as old. See n. 20, *supra.*

[22] State laws authorizing the impairment of municipal bond contracts have been held unconstitutional. *W. B. Worthen Co.* v. *Kavanaugh,* 295 U. S. 56 (1935); *Louisiana* v. *Pilsbury,* 105 U. S. 278 (1882). Similarly, a tax on municipal bonds was held unconstitutional because its effect was to reduce the contractual rate of interest. *Murray* v. *Charleston,* 96 U. S. 432, 443–446 (1878).

A number of cases have held that a State may not authorize a municipality to borrow money and then restrict its taxing power so that the debt cannot be repaid. *Louisiana ex rel. Hubert* v. *New Orleans,* 215 U. S. 170, 175–178 (1909); *Wolff* v. *New Orleans,* 103 U. S. 358, 365–368 (1881);

within the reserved powers that cannot be contracted away.[23] Not every security provision, however, is necessarily financial. For example, a revenue bond might be secured by the State's promise to continue operating the facility in question; yet such a promise surely could not validly be construed to bind the State never to close the facility for health or safety reasons. The security provision at issue here, however, is different: The States promised that revenues and reserves securing the bonds would not be depleted by the Port Authority's operation of deficit-producing passenger railroads beyond the level of "permitted deficits." Such a promise is purely financial and thus not necessarily a compromise of the State's reserved powers.

Of course, to say that the financial restrictions of the 1962 covenant were valid when adopted does not finally resolve this case. The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations.[24] As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying

---

*Von Hoffman* v. *City of Quincy,* 4 Wall., at 554–555. See *Fisk* v. *Jefferson Police Jury,* 116 U. S. 131 (1885) (contract for payment of public officer).

See also *Wood* v. *Lovett,* 313 U. S. 362 (1941); *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95 (1938).

[23] "The truth is, States and cities, when they borrow money and contract to repay it with interest, are not acting as sovereignties. They come down to the level of ordinary individuals. Their contracts have the same meaning as that of similar contracts between private persons. Hence, instead of there being in the undertaking of a State or city to pay, a reservation of a sovereign right to withhold payment, the contract should be regarded as an assurance that such a right will not be exercised. A promise to pay, with a reserved right to deny or change the effect of the promise, is an absurdity." *Murray* v. *Charleston,* 96 U. S., at 445.

[24] See *El Paso* v. *Simmons,* 379 U. S. 497 (1965); *Faitoute Iron & Steel Co.* v. *City of Asbury Park,* 316 U. S. 502 (1942); *Louisiana* v. *New Orleans,* 102 U. S. 203 (1880).

this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.[25]

The trial court recognized to an extent the special status of a State's financial obligations when it held that *total* repudiation, presumably for even a worthwhile public purpose, would be unconstitutional. But the trial court regarded the protection of the Contract Clause as available only in such an extreme case: "The states' inherent power to protect the public welfare may be validly exercised under the Contract Clause even if it impairs a contractual obligation so long as it does not destroy it." 134 N. J. Super., at 190, 338 A. 2d, at 870–871.

The trial court's "total destruction" test is based on what we think is a misreading of *W. B. Worthen Co.* v. *Kavanaugh,* 295 U. S. 56 (1935).[26] In the first place, the impairment held

---

[25] For similar reasons, a dual standard of review was applied under the Fifth Amendment to federal legislation abrogating contractual gold clauses. "There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of the Congress to alter or repudiate the substance of its own engagements when it has borrowed money under the authority which the Constitution confers." *Perry* v. *United States,* 294 U. S. 330, 350–351 (1935). Cf. *Norman* v. *Baltimore & O. R. Co.,* 294 U. S. 240, 304–305 (1935). See also *Lynch* v. *United States,* 292 U. S. 571, 580 (1934) (need for money is no excuse for repudiating contractual obligations); Note, The Constitutionality of the New York Municipal Wage Freeze and Debt Moratorium: Resurrection of the Contract Clause, 125 U. Pa. L. Rev. 167, 188–191 (1976).

[26] In *Kavanaugh,* the State changed its statutory procedure for enforcing certain municipal assessments against property owners. The holders of bonds for which the assessments were pledged as security were found to

unconstitutional in *Kavanaugh* was one that affected the value of a security provision, and certainly not every bond would have been worthless. More importantly, Mr. Justice Cardozo needed only to state an "outermost limits" test in the Court's opinion, *id.,* at 60, because the impairment was so egregious. He expressly recognized that the actual line between permissible and impermissible impairments could well be drawn more narrowly. Thus the trial court was not correct when it drew the negative inference that any impairment less oppressive than the one in *Kavanaugh* was necessarily constitutional. The extent of impairment is certainly a relevant factor in determining its reasonableness. But we cannot sustain the repeal of the 1962 covenant simply because the bondholders' rights were not totally destroyed.

The only time in this century that alteration of a municipal bond contract has been sustained by this Court was in *Faitoute Iron & Steel Co.* v. *City of Asbury Park,* 316 U. S. 502 (1942). That case involved the New Jersey Municipal Finance Act, which provided that a bankrupt local government could be placed in receivership by a state agency. A plan for the composition of creditors' claims was required to be approved by the agency, the municipality, and 85% in amount of the creditors. The plan would be binding on nonconsenting creditors after a state court conducted a hearing and found that the municipality could not otherwise pay off its creditors and that the plan was in the best interest of all creditors. *Id.,* at 504.

---

have contract rights in the previous statutory scheme. Without classifying the enforcement statutes as substantive or remedial, the Court held the change unconstitutional because it "[took] from the mortgage the quality of an acceptable investment for a rational investor." 295 U. S., at 60. In the instant case the State has repudiated an express promise rather than one implied from the statutory scheme in effect at the time of the contract. Thus, the instant case may be regarded as a more serious abrogation of the bondholders' expectations than occurred in *Kavanaugh.* See n. 17, *supra.*

Under the specific composition plan at issue in *Faitoute,* the holders of revenue bonds received new securities bearing lower interest rates and later maturity dates. This Court, however, rejected the dissenting bondholders' Contract Clause objections. The reason was that the old bonds represented only theoretical rights; as a practical matter the city could not raise its taxes enough to pay off its creditors under the old contract terms. The composition plan enabled the city to meet its financial obligations more effectively. "The necessity compelled by unexpected financial conditions to modify an original arrangement for discharging a city's debt is implied in every such obligation for the very reason that thereby the obligation is discharged, not impaired." *Id.,* at 511. Thus, the Court found that the composition plan was adopted with the purpose and effect of protecting the creditors, as evidenced by their more than 85% approval. Indeed, the market value of the bonds increased sharply as a result of the plan's adoption. *Id.,* at 513.

It is clear that the instant case involves a much more serious impairment than occurred in *Faitoute.* No one has suggested here that the States acted for the purpose of benefiting the bondholders, and there is no serious contention that the value of the bonds was enhanced by repeal of the 1962 covenant. Appellees recognized that it would have been impracticable to obtain consent of the bondholders for such a change in the 1962 covenant, Brief for Appellees 97–98, even though only 60% approval would have been adequate. See n. 10, *supra.* We therefore conclude that repeal of the 1962 covenant cannot be sustained on the basis of this Court's prior decisions in *Faitoute* and other municipal bond cases.

V

Mass transportation, energy conservation, and environmental protection are goals that are important and of legitimate public concern. Appellees contend that these goals are so

important that any harm to bondholders from repeal of the 1962 covenant is greatly outweighed by the public benefit. We do not accept this invitation to engage in a utilitarian comparison of public benefit and private loss. Contrary to Mr. Justice Black's fear, expressed in sole dissent in *El Paso* v. *Simmons,* 379 U. S., at 517, the Court has not "balanced away" the limitation on state action imposed by the Contract Clause. Thus a State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors. We can only sustain the repeal of the 1962 covenant if that impairment was both reasonable and necessary to serve the admittedly important purposes claimed by the State.[27]

The more specific justification offered for the repeal of the 1962 covenant was the States' plan for encouraging users of private automobiles to shift to public transportation. The States intended to discourage private automobile use by raising bridge and tunnel tolls and to use the extra revenue from those tolls to subsidize improved commuter railroad service. Appellees contend that repeal of the 1962 covenant was necessary to implement this plan because the new mass transit facilities could not possibly be self-supporting and the covenant's "permitted deficits" level had already been exceeded. We reject this justification because the repeal was neither necessary to achievement of the plan nor reasonable in light of the circumstances.

The determination of necessity can be considered on two levels. First, it cannot be said that total repeal of the cov-

---

[27] The dissent suggests, *post,* at 41–44, that such careful scrutiny is unwarranted in this case because the harm to bondholders is relatively small. For the same reason, however, contractual obligations of this magnitude need not impose barriers to changes in public policy. The States remain free to exercise their powers of eminent domain to abrogate such contractual rights, upon payment of just compensation. See n. 16, *supra.*

enant was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the covenant's limitations on the use of Port Authority revenues and reserves to subsidize commuter railroads.[28] Second, without modifying the covenant at all, the States could have adopted alternative means of achieving their twin goals of discouraging automobile use and improving mass transit.[29] Appellees contend, however, that choosing among these alternatives is a matter for legislative discretion. But a State is not completely free to consider impairing the obliga-

---

[28] If in fact the States sought to divert only new revenues to subsidize mass transit, then the covenant could have been amended to exclude the additional bridge and tunnel tolls from the revenue use limitation that was imposed. Such a change would not have reduced the covenant to a nullity because it would have continued to prevent the diminution of revenues and reserves that historically secured the bonds. And even if the plan contemplated use of current revenues and reserves, the formula for computing "permitted deficits" perhaps could have been modified without totally abandoning an objective limitation on the Port Authority's involvement in deficit mass transit. Finally, the procedures for obtaining bondholder approval could have been modified so that such consent would present a feasible means of undertaking new projects. See n. 10, *supra*.

Of course, we express no opinion as to whether any of these lesser impairments would be constitutional.

[29] Transportation control strategies are available that do not require direct application of revenues from bridge and tunnel tolls to subsidize mass transit. In calling for air pollution abatement measures in New Jersey, the Administrator of the Environmental Protection Agency encouraged "close examination" of such measures as, *inter alia*, "State taxes to encourage VMT [vehicle miles traveled] reductions while raising revenues to benefit mass transit" and realignment of toll structures by "elimination of commuter discounts" and "possibly an increase in tolls during peak commuting times to encourage carpools." 38 Fed. Reg. 31389 (1973). Thus, the States could discourage automobile use through taxes on gasoline or parking, for example, and use the revenues to subsidize mass transit projects so they would be "self-supporting" within the meaning of the covenant. Bridge and tunnel tolls could be increased for commuters and decreased at other times, so that there would be no excess revenue for purposes of the General Bridge Act of 1946, 33 U. S. C. § 526.

tions of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well. In *El Paso* v. *Simmons, supra,* the imposition of a five-year statute of limitations on what was previously a perpetual right of redemption was regarded by this Court as "quite clearly necessary" to achieve the State's vital interest in the orderly administration of its school lands program. 379 U. S., at 515–516. In the instant case the State has failed to demonstrate that repeal of the 1962 covenant was similarly necessary.

We also cannot conclude that repeal of the covenant was reasonable in light of the surrounding circumstances. In this regard a comparison with *El Paso* v. *Simmons, supra,* again is instructive. There a 19th century statute had effects that were unforeseen and unintended by the legislature when originally adopted. As a result speculators were placed in a position to obtain windfall benefits. The Court held that adoption of a statute of limitation was a reasonable means to "restrict a party to those gains reasonably to be expected from the contract" when it was adopted. 379 U. S., at 515.[30]

By contrast, in the instant case the need for mass transportation in the New York metropolitan area was not a new development, and the likelihood that publicly owned commuter railroads would produce substantial deficits was well known. As early as 1922, over a half century ago, there were pressures to involve the Port Authority in mass transit. It was with

---

[30] This Court previously has regarded the elimination of unforeseen windfall benefits as a reasonable basis for sustaining changes in statutory deficiency judgment procedures. These changes were adopted by several States when unexpected reductions in property values during the Depression permitted some mortgagees to recover far more than their legitimate entitlement. See *Gelfert* v. *National City Bank,* 313 U. S. 221, 233–235 (1941); *Honeyman* v. *Jacobs,* 306 U. S. 539, 542–543 (1939); *Richmond Mortgage & Loan Corp.* v. *Wachovia Bank & Trust Co.,* 300 U. S. 124, 130–131 (1937).

full knowledge of these concerns that the 1962 covenant was adopted. Indeed, the covenant was specifically intended to protect the pledged revenues and reserves against the possibility that such concerns would lead the Port Authority into greater involvement in deficit mass transit.

During the 12-year period between adoption of the covenant and its repeal, public perception of the importance of mass transit undoubtedly grew because of increased general concern with environmental protection and energy conservation. But these concerns were not unknown in 1962, and the subsequent changes were of degree and not of kind. We cannot say that these changes caused the covenant to have a substantially different impact in 1974 than when it was adopted in 1962. And we cannot conclude that the repeal was reasonable in the light of changed circumstances.

We therefore hold that the Contract Clause of the United States Constitution prohibits the retroactive repeal of the 1962 covenant. The judgment of the Supreme Court of New Jersey is reversed.

*It is so ordered.*

MR. JUSTICE STEWART took no part in the decision of this case.

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE BURGER, concurring.

In my view, to repeal the 1962 covenant without running afoul of the constitutional prohibition against the impairment of contracts, the State must demonstrate that the impairment was essential to the achievement of an important state purpose. Furthermore, the State must show that it did not know and could not have known the impact of the contract on that state interest at the time that the contract was made. So reading the Court's opinion, I join it.

For emphasis, I note that the Court pointedly does not hold that, on the facts of this case, any particular "less drastic modification" would pass constitutional muster, *ante,* at 30, and n. 28.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE and MR. JUSTICE MARSHALL join, dissenting.

Decisions of this Court for at least a century have construed the Contract Clause largely to be powerless in binding a State to contracts limiting the authority of successor legislatures to enact laws in furtherance of the health, safety, and similar collective interests of the polity. In short, those decisions established the principle that lawful exercises of a State's police powers stand paramount to private rights held under contract. Today's decision, in invalidating the New Jersey Legislature's 1974 repeal of its predecessor's 1962 covenant, rejects this previous understanding and remolds the Contract Clause into a potent instrument for overseeing important policy determinations of the state legislature. At the same time, by creating a constitutional safe haven for property rights embodied in a contract, the decision substantially distorts modern constitutional jurisprudence governing regulation of private economic interests. I might understand, though I could not accept, this revival of the Contract Clause were it in accordance with some coherent and constructive view of public policy. But elevation of the Clause to the status of regulator of the municipal bond market at the heavy price of frustration of sound legislative policy-making is as demonstrably unwise as it is unnecessary. The justification for today's decision, therefore, remains a mystery to me, and I respectfully dissent.

I

The Court holds that New Jersey's repeal of the 1962 covenant constitutes an unreasonable invasion of contract rights and hence an impairment of contract. The formulation of

the legal standard by which the Court would test asserted impairments of contracts is, to me, both unprecedented and most troubling. But because the Constitution primarily is " 'intended to preserve practical and substantial rights, not to maintain theories,' " *Faitoute Iron & Steel Co.* v. *City of Asbury Park,* 316 U. S. 502, 514 (1942), it is necessary to sketch the factual background of this dispute before discussing the reasons for my concern. In my view, the Court's casual consideration both of the substantial public policies that prompted New Jersey's repeal of the 1962 covenant, and of the relatively inconsequential burdens that resulted for the Authority's creditors, belies its conclusion that the State acted unreasonably in seeking to relieve its citizens from the strictures of this earlier legislative policy.

## A

In an era when problems of municipal planning increasingly demand regional rather than local solutions, the Port Authority provides the New York-New Jersey community with a readymade, efficient regional entity encompassing some 1,500 square miles surrounding the Statue of Liberty. As the Court notes, from the outset public officials of both New York and New Jersey were well aware of the Authority's heavy dependence on public financing. Consequently, beginning in the decade prior to the enactment of the 1962 covenant, the Authority's general reserve bonds, its primary vehicle of public finance, have featured two rigid security devices designed to safeguard the investment of bondholders. First, pursuant to a so-called "1.3 test," the Authority has been disabled from issuing new consolidated bonds unless the best one-year net revenues derived from all of the Authority's facilities at least equal 130% of the prospective debt service for the calendar year during which the debt service for all outstanding and proposed bonds would be at a maximum. Second, according to a procedure known as a "section 7 certifi-

cation," the Authority may not issue bonds to finance additional facilities unless it "shall certify" that the issue "will not, during the ensuing ten years or during the longest term of any such bonds proposed to be issued . . . , whichever shall be longer, . . . materially impair the sound credit standing of the Authority . . . ." App. 811a–812a.

The 1962 covenant existed alongside these security provisions. Viewed in simplest terms, the covenant served to preclude Authority investment and participation in transportation programs by shifting the financial focal point from the creditworthiness of the Authority's activities as a whole to the solvency of each proposed new transit project. Whereas the 1.3 and section 7 tests permit expanded involvement in mass transportation provided that the enormous revenue-generating potential of the Authority's bridges and tunnels aggregately suffice to secure the investments of creditors, the covenant effectively foreclosed participation in any new project that was not individually "self-supporting."[1] Both parties to this litigation are in apparent agreement that few functional mass transit systems are capable of satisfying this requirement.

Whether the 1962 New Jersey Legislature acted wisely in accepting this new restriction is, for me, quite irrelevant. What is important is that the passage of the years conclusively demonstrated that this effective barrier to the development

---

[1] The covenant does enable the Authority to finance passenger railroad facilities to a level of "permitted deficits," defined as one-tenth of the General Reserve Fund or 1% of the total bonded indebtedness. While the Court notes in passing that this provision "permitted, and perhaps even contemplated, additional Port Authority involvement in deficit rail mass transit," *ante*, at 11, the formula restricts the Authority to a small percentage of the fund, even though aggregate reserves and revenues may far exceed expenses and creditor claims. In any event, the parties have stipulated that as a practical matter the Authority has been unable to expand its involvement in rapid transit by reliance on this alternative formula. App. 692a.

of rapid transit in the port region squarely conflicts with the legitimate needs of the New York metropolitan community, and will persist in doing so into the next century.[2]  In the Urban Mass Transportation Assistance Act of 1970, 49 U. S. C. § 1601a, Congress found that "within urban areas . . . the ability of all citizens to move quickly and at a reasonable cost [has become] an urgent national problem."  Concurrently, the Clean Air Act, as amended, 42 U. S. C. § 1857 *et seq.*, advocated the curtailment of air pollution through the development of transportation-control strategies that place heavy emphasis on rapid transit alternatives to the automobile.  For northern New Jersey in particular, with ambient air-quality levels among the worst in the Nation, the Clean Air Act has led to new regulations premised on the policy:

> "The development of large-scale mass transit facilities and the expansion and modification of existing mass transit facilities is essential to any effort to reduce automotive pollution through reductions in vehicle use.  The planning, acquisition, and operation of a mass transit system is, and should remain, a regional or State responsibility.  Many improvements are being planned in mass transit facilities in the State that will make it possible for more people to use mass transit instead of automobiles."  38 Fed. Reg. 31389 (1973).

Finally, the Court itself cites the Emergency Petroleum Allocation Act, 15 U. S. C. § 751 (a)(3) (1970 ed., Supp. V), which signaled "a national energy crisis which is a threat to the public health, safety, and welfare," and sought to stimulate

---

[2] The 1962 covenant does not merely bind the Authority's hands for the decades of the 1960's and 1970's.  Rather, the covenant will preclude the deployment of the Authority's toll revenues to public transit needs until all the bonds previously issued under the covenant have been retired. Appellant trust company advises that the covenant thus continues "as a practical matter until the year 2007," Brief for Appellant 24, even if now repealed prospectively as suggested *ante*, at 18 n. 15.

further initiatives toward the development of public transportation and similar programs.   See *ante,* at 14.

It was in response to these societal demands that the New Jersey and New York Legislatures repealed the 1962 covenant. The trial court found:

> "In April 1970 Governors Cahill and Rockefeller announced a joint program to increase the Port Authority's role in mass transportation by building a rail link to John F. Kennedy International Airport and extending PATH [a commuter rail line under Authority control] to Newark International Airport and other parts of New Jersey." 134 N. J. Super. 124, 168–169, 338 A. 2d 833, 858 (1975).

But, the court found, this expansion "was not economically feasible under the terms of the 1962 covenant." *Id.,* at 170, 338 A. 2d, at 859.   Consequently, the States repealed the covenant.   On signing the New York legislation, Governor Rockefeller stated:

> "Passed with overwhelming bipartisan support in both houses of the Legislature, the bill removes the absolute statutory prohibition against the use of the revenues of the Port of New York Authority for railroad purposes. That statutory covenant, together with the provision of the bi-state compact creating the Authority that neither State will construct competing facilities within the Port District, could forever preclude the two states from undertaking vitally needed mass transportation projects. In removing the present restriction, the bill would not jeopardize the security of Port Authority bondholders or their rights to maintain that security."   Quoted *ibid.*

In following suit, New Jersey also expressly grounded its action upon the necessity of overturning " 'the restrictions imposed by the covenant [that] effectively preclude sufficient port authority participation in the development of a public transportation system in the port district.' "   *Id.,* at 172, 338

A. 2d, at 860. Approximately one year later, on April 10, 1975, the Port Authority announced an increase in bridge and tunnel tolls amounting to $40 million, the resulting revenue designed to assist in the financing of passenger transportation facilities without jeopardizing the reserve fund set aside for the Authority's creditors.

The Court's consideration of this factual background is, I believe, most unsatisfactory. The Court never explicitly takes issue with the core of New Jersey's defense of the repeal: that the State was faced with serious and growing environmental, energy, and transportation problems, and the covenant worked at cross-purposes with efforts at remedying these concerns. Indeed, the Court candidly concedes that the State's purposes in effectuating the 1974 repeal were "admittedly important." *Ante,* at 29. Instead, the Court's analysis focuses upon related, but peripheral, matters.

For example, several hypothetical alternative methods are proposed whereby New Jersey might hope to secure funding for public transportation, and these are made the basis for a holding that repeal of the covenant was not "necessary." *Ante,* at 29–31. Setting aside the propriety of this surprising legal standard,[3] the Court's effort at fashioning its own legislative program for New York and New Jersey is notably unsuccessful. In fact, except for those proffered alternatives which also amount to a repeal or substantial modification of the 1962 covenant,[4] none of the Court's suggestions is com-

---

[3] See, *e. g., infra,* at 59, and n. 17.

[4] See *ante,* at 30 n. 28. I am puzzled whether the Court really intends these alternatives to be taken seriously in view of the footnote's closing reminder that even these "lesser impairments" also may be found to be unconstitutional. If the Court, in fact, means that New Jersey and New York could remedy any Contract Clause defects merely by modifying their repeal of the 1962 covenant so as to limit transit subsidization solely to future toll increases—the policy that is being followed by the States in actual practice—then today's decision would be rendered into a temporary formalism.

patible with the basic antipollution and transportation-control strategies that are crucial to metropolitan New York. As the Court itself accurately recognizes, the environmental and transportation program for the New York area rests upon a two-step campaign: "The States inten[d] [1] to discourage private automobile use by raising bridge and tunnel tolls and [2] to use the extra revenue from those tolls to subsidize improved commuter railroad service." *Ante,* at 29. This coordinated two-step strategy has not been arbitrarily or casually created, but is dictated by contemporaneous federal enactments such as the Clean Air Act,[5] and stems both from New York City's unique geographic situation [6] and from long-standing provisions in federal law that require the existence of "reasonable and just" expenses—which may include diversion to mass transit subsidies—as a precondition to any increase in interstate bridge tolls.[7] The Court's various

---

[5] Cf. *Friends of the Earth* v. *Carey,* 552 F. 2d 25 (CA2 1977); *Friends of the Earth* v. *Carey,* 535 F. 2d 165 (CA2 1976); *Friends of the Earth* v. *EPA,* 499 F. 2d 1118 (CA2 1974).

[6] Because cars entering or leaving Manhattan must pass over bridges or through tunnels, the regulation of tolls offers an unusually convenient and effective method of discouraging automobile usage in addition to promising a highly lucrative revenue base.

[7] Thus, if toll funds cannot be diverted to rapid transit needs, any increase in bridge revenues necessarily would produce an expansion of the Authority's general reserve fund well beyond that necessary or contemplated for the protection of bondholders. Faced with such a mere accumulation of capital, the Federal Highway Administrator, acting under § 503 of the General Bridge Act of 1946, 33 U. S. C. § 526, evidently would be obligated to disallow any toll increases as not "reasonable and just" under the Act. See generally *Delaware River Port Authority* v. *Tiemann,* 531 F. 2d 699 (CA3 1976). The United States Department of Transportation, however, has stated that "in some areas (New York, Philadelphia, San Francisco), bridge toll revenues provide significant support for transit capital and/or operating costs, thereby providing transit service improvements which promote decreased dependence on automobile travel." App. 726a–727a. The Department has recommended that a diversion of funds

alternative proposals, while perhaps interesting speculations, simply are not responsive to New York's and New Jersey's real environmental and traffic problems,[8] and, in any event, intrude the Court deeply into complex and localized policy matters that are for the States' legislatures and not the judiciary to resolve.

Equally unconvincing is the Court's contention that repeal of the 1962 covenant was unreasonable because the environmental and energy concerns that prompted such action "were not unknown in 1962, and the subsequent changes were of degree and not of kind." *Ante,* at 32. Nowhere are we told why a state policy, no matter how responsive to the general welfare of its citizens, can be reasonable only if it confronts issues that previously were absolutely unforeseen.[9] Indeed,

---

to serve rapid transit needs should qualify as "reasonable and just," and, therefore, would be capable of supporting a general increase in toll revenues. *Ibid.* This is in stark contrast with the Court's suggested alternative policies outlined *ante,* at 30 n. 29, which would permit no general increase in bridge tolls and no coordination of the bridge toll and transit subsidization strategies that are central to the antipollution effort in metropolitan New York, and, therefore, until today, have been considered secondary and inadequate to serve the community's needs.

[8] See, *e. g.,* n. 7, *supra.* In short, all the alternatives that the Court leaves to the States, *ante,* at 30 n. 29, deny access to the Authority's tolls, even though they represent a potentially lucrative revenue source which can be tapped without injury to the bondholders. See Part B, *infra.*

[9] Indeed, the Court's single-minded emphasis on the existence of changed circumstances leads it to embrace a rather perverse constellation of values in which New Jersey's desire to care for the health, environmental, and energy needs of its citizenry is relegated to lesser importance than the desire of Texas in *El Paso* v. *Simmons,* 379 U. S. 497 (1965), to deny windfall economic gains to purchasers of school land from the State. *Ante,* at 31. I, of course, do not dispute the importance of Texas' stake in *Simmons.* But surely any reasonable ordering of values and social objectives would compel the conclusion that a State's concern for its citizens' health and general welfare is far more deserving of this Court's recognition.

this arbitrary perspective seems peculiarly inappropriate in a case like this where at least three new and independent congressional enactments between the years 1962 and 1974 summoned major urban centers like New York and New Jersey to action in the environmental, energy, and transportation fields. In short, on this record, I can neither understand nor accept the Court's characterization of New Jersey's action as unreasonable.

B

If the Court's treatment of New Jersey's legitimate policy interests is inadequate, its consideration of the countervailing injury ostensibly suffered by the appellant is barely discernible at all. For the Court apparently holds that a mere "technical impairment" of contract suffices to subject New Jersey's repealer to serious judicial scrutiny and invalidation under the Contract Clause. *Ante,* at 21. The Court's modest statement of the economic injury that today attracts its judicial intervention is, however, understandable. For fairly read, the record before us makes plain that the repeal of the 1962 covenant has occasioned only the most minimal damage on the part of the Authority's bondholders.

Obviously, the heart of the obligation to the bondholders— and the interests ostensibly safeguarded by the 1962 covenant—is the periodic payment of interest and the repayment of principal when due. The Court does not, and indeed cannot, contend that either New Jersey or the Authority has called into question the validity of these underlying obligations. No creditor complains that public authorities have defaulted on a coupon payment or failed to redeem a bond that has matured. In fact, the Court does not even offer any reason whatever for fearing that, as a result of the covenant's repeal, the securities in appellant's portfolio are jeopardized. Such a contention cannot be made in the face of the finding of the trial judge, who, in referring to the increasingly lucrative financial

position of the Authority at the date of the covenant's repeal in comparison to 1962, concluded:

"Suffice it to say that between 1962 and 1974 the security afforded bondholders had been substantially augmented by a vast increase in Authority revenues and reserves, and the Authority's financial ability to absorb greater deficits, from whatever source and without any significant impairment of bondholder security, was correspondingly increased." 134 N. J. Super., at 194–195, 338 A. 2d, at 873.[10]

By simply ignoring this unchallenged finding concerning the Authority's overall financial posture, the Court is able to argue that the repeal of the 1962 covenant impaired the Authority's bonds in two particular respects. First, it is suggested that repeal of the covenant may have adversely affected the secondary market for the securities. *Ante,* at 19. The Court, however, acknowledges that appellant has adduced only ambiguous evidence to support this contention, and that the actual price position of Authority bonds was, at most, only temporarily affected by the repeal. *Ibid.*[11] In fact, the trial

---

[10] The court found: "Between 1961 and 1973 the net revenues of the Authority increased from $68,000,000 to $137,000,000, and over that period the Authority had available to it $582,732,000 in excess of its debt service requirements . . . . Through 1974, the corresponding figures are $161,283,000 and $649,750,000, respectively." 134 N. J. Super., at 195 n. 43, 338 A. 2d, at 873 n. 43. Thus, both prior to and following the repeal of the covenant, the Authority's revenues and earned surplus continued their unhampered and overwhelmingly impressive growth.

[11] Indeed, one of the anomalous aspects of this suit is the Court's willingness to invalidate an Act of the State of New Jersey, and indirectly of New York, while apparently recognizing that if this were an action by creditors for damages, or an action to fix "just compensation," the trial court's findings raise serious doubt that any compensable monetary loss would be found. *Ante,* at 19. By sidestepping the damages question, *ibid.,* and by mandating reinstatement of the covenant, the Court manages to burden the Port Authority with an unwanted contract, while relieving the creditor-appellant of the need to establish any tangible

court also explicitly rejected the ultimate significance of this alleged injury:

> "The bottom line of plaintiff's proofs on this issue is simply that the *evidence fails to demonstrate that the secondary market price of Authority bonds was adversely affected by the repeal of the covenant,* except for a short-term fall-off in price, the effect of which has now been dissipated insofar as it can be related to the enactment of the repeal." 134 N. J. Super., at 181–182, 338 A. 2d, at 866 (emphasis supplied).

Secondly, repeal of the covenant is said to have canceled an important security provision enjoyed by the creditors. *Ante,* at 19. Of course, there is no question that appellant prefers the retention to the removal of the covenant, but surely this alone cannot be an acceptable basis for the Court's wooden application of the Contract Clause or for its conclusion that the repeal unfairly diminished bondholder security. By placing reliance on this superficial allegation of economic injury, the Court again is able simply to disregard the trial court's contrary finding that appellant's complaint of insecurity is without factual merit:

> "*The claim that bondholder security has been materially impaired or destroyed by the repeal is simply not supported by the record.* The pledge of the Authority's net revenues and reserves remains intact; the Authority will still be barred from the issuance of any new consolidated bonds unless the 1.3 test required by the CBR is met, and the Authority will continue to be prohibited from the

---

economic injury arising from the covenant's repeal. This suggests that any protection afforded bondholders today may well prove to be purely illusory. Even after the mandate issues, New Jersey, we are told, may again condemn or repeal the covenant and offer just compensation to its creditors. See *ante,* at 29 n. 27. However, in light of the trial court's factual conclusions, this promise of compensation will entitle bondholders to little or no financial recovery.

issuance of any consolidated bonds or other bonds secured by a pledge of the general reserve fund without the certification required by section 7 of the series resolutions, to wit, that in the opinion of the Authority the estimated expenditures in connection with any additional facility for which such bonds are to be issued would not, for the ensuing ten years, impair the sound credit standing of the Authority, the investment status of its consolidated bonds, or the Authority's obligations to its consolidated bondholders." 134 N. J. Super., at 196, 338 A. 2d, at 874 (emphasis supplied).[12]

In brief, only by disregarding the detailed factual findings of the trial court in a systematic fashion is the Court today able to maintain that repeal of the 1962 covenant was anything but a minimal interference with the realistic economic interests of the bondholders. The record in this case fairly establishes that we are presented with a relatively inconsequential infringement of contract rights in the pursuit of substantial and important public ends. Yet, this meager record is seized upon by the Court as the vehicle for resuscitation of long discarded Contract Clause doctrine—a step out of line with both the history of Contract Clause jurisprudence and with constitutional doctrine generally in its attempt to delineate the reach of the lawmaking power of state legislatures in the face of adverse claims by property owners.

II

The Court today dusts off the Contract Clause and thereby undermines the bipartisan policies of two States that mani-

---

[12] The fundamental soundness of the Authority's bonds is reflected in the ratings received from the principal financial surveys, Moody's and Standard & Poor's, following repeal of the covenant. The trial court found: "The bonds carried the same ["A"] rating prior to the enactment of the covenant, after it was enacted, after it was prospectively repealed, and after the [retroactive] repeal act of 1974." 134 N. J. Super., at 179, 338 A. 2d, at 864.

festly seek to further the legitimate needs of their citizens. The Court's analysis, I submit, fundamentally misconceives the nature of the Contract Clause guarantee.

One of the fundamental premises of our popular democracy is that each generation of representatives can and will remain responsive to the needs and desires of those whom they represent. Crucial to this end is the assurance that new legislators will not automatically be bound by the policies and undertakings of earlier days. In accordance with this philosophy, the Framers of our Constitution conceived of the Contract Clause primarily as protection for economic transactions entered into by purely private parties, rather than obligations involving the State itself. See G. Gunther, Constitutional Law 604 (1975); B. Schwartz, A Commentary On the Constitution of the United States, pt. 2, The Rights of Property 274 (1965); B. Wright, The Contract Clause of the Constitution 15–16 (1938).[13] The Framers fully recognized that nothing would so jeopardize the legitimacy of a system of government that relies upon the ebbs and flows of politics to "clean out the rascals" than the possibility that those same rascals might perpetuate their policies simply by locking them into binding contracts.

Following an early opinion of the Court, however, that

---

[13] One scholar for example, after undertaking extensive research into the history of the Constitutional Convention, concluded that there is no evidence that the Constitution's Framers perceived of the Contract Clause as applicable to public agreements. "[I]t is evident that all of them discussed the clause only in relation to private contracts, i. e., contracts between individuals." B. Wright, The Contract Clause of the Constitution 15 (1938). Moreover, "[a] careful search has failed to unearth any other statements even suggesting that the contract clause was intended to apply to other than private contracts." Id., at 16. Indeed, Professor Wright found that only two antifederalists, neither of whom was a member of the Convention, ever suggested that the Clause would support "a broader meaning" encompassing public contracts, but "their interpretations were denied by members of the Convention, and the denials were not challenged." Ibid.

took the first step of applying the Contract Clause to public undertakings, *Fletcher* v. *Peck,* 6 Cranch 87 (1810), later decisions attempted to define the reach of the Clause consistently with the demands of our governing processes. The central principle developed by these decisions, beginning at least a century ago, has been that Contract Clause challenges such as that raised by appellant are to be resolved by according unusual deference to the lawmaking authority of state and local governments. Especially when the State acts in furtherance of the variety of broad social interests that came clustered together under the rubric of "police powers," see E. Freund, The Police Power (1904)—in particular, matters of health, safety, and the preservation of natural resources— the decisions of this Court pursued a course of steady return to the intention of the Constitution's Framers by closely circumscribing the scope of the Contract Clause.

This theme of judicial self-restraint and its underlying premise that a State always retains the sovereign authority to legislate in behalf of its people was commonly expressed by the doctrine that the Contract Clause will not even recognize efforts of a State to enter into contracts limiting the authority of succeeding legislators to enact laws in behalf of the health, safety, and similar collective interests of the polity [14]—in

---

[14] Parallel doctrines worked to the same end of freeing the States from contractual duties allegedly imposed by earlier legislators. For example, it has long been held that in applying the Contract Clause to government contracts, every ambiguity and gap is to be strictly construed in behalf of the State. "[I]n grants by the public, nothing passes by implication." *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 546 (1837). "Every reasonable doubt is to be resolved adversely [to the private party claiming under the contract]. Nothing is to be taken as conceded but what is given in unmistakable terms, or by an implication equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare." *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659, 666 (1878).

Along these lines, it is noteworthy that the state law of New Jersey itself raises serious doubts concerning the reasonableness of appellant's

short, that that State's police power is inalienable by contract. For example, in *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659 (1878), the Illinois General Assembly granted to a fertilizer company an 1867 corporate charter to run for 50 years. The corporation thereafter invested in a factory and depot on land which it owned within the area designated by the charter. Five years later, the village authorities of Hyde Park adopted an ordinance that rendered the company's charter valueless

---

reliance on the covenant for permanent protection from later laws enacted by the state legislature. In a case involving an alleged impairment of a township's municipal bonds, *Hourigan* v. *North Bergen Township*, 113 N. J. L. 143, 149, 172 A. 193, 196 (1934), the State's highest court declared: "It is a well established doctrine that the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals. While this power is subject to limitations in certain cases, there is wide discretion on the part of the legislature in determining what is and what is not necessary—a discretion which courts ordinarily will not interfere with." In my view, therefore, appellant should be held to have purchased the Authority's bonds subject to the knowledge that under New Jersey law the State's obligation was conditionally undertaken subject to reasonable future legislative action.

The record raises similiar doubts and ambiguities. Thus, State Senator Farley, who chaired the committee that inquired into the status of the Authority's bonds prior to enactment of the covenant, noted: "[W]e well appreciate that . . . we could not impair any obligation such as contracts of bond issues. Likewise, you [Commissioner Clancy of the Port Authority] as a lawyer know that *one legislature cannot bind the other involving policy five, ten, or twenty years hence.*" App. 89a (emphasis supplied). It may well be that appellant subjectively believed that the covenant was unimpeachable under state law. But given the doubts and hesitancies contained in the record, the principles established in earlier cases extending back to John Marshall should require that such "doubt is fatal to [appellant's] claim." *Fertilizing Co., supra,* at 666.

by prohibiting the transportation of offal within the village and forbidding the operation of a fertilizer factory within the village confines. This Court nonetheless rejected the contention that the new ordinance offended the Contract Clause:

"We cannot doubt that the police power of the State was applicable and adequate to give an effectual remedy [to the nuisance]. That power belonged to the States when the Federal Constitution was adopted. They did not surrender it, and they all have it now. . . .

.        .        .        .        .

". . . Pure air and the comfortable enjoyment of property are as much rights belonging to [the village residents] as the right of possession and occupancy. . . .

.        .        .        .        .

"The [company's] charter was a sufficient license until revoked; but we cannot regard it as a contract guaranteeing, in the locality originally selected, exemption for fifty years from the exercise of the police power of the State, however serious the nuisance might become in the future . . . ." *Id.,* at 667, 669, 670.

Two years later, this principle of the Contract Clause's subservience to the States' broad lawmaking powers was reasserted in another context. In 1867, the Mississippi Legislature entered into a contract with a company whereby the latter was chartered to operate a lottery within the State "in consideration of a stipulated sum in cash . . . ." The next year the State adopted a constitutional provision abolishing lotteries. The Court once again unhesitantly dismissed a challenge to this provision grounded on the Contract Clause, *Stone* v. *Mississippi,* 101 U. S. 814, 817–818 (1880):

" 'Irrevocable grants of property and franchises may be made if they do not impair the supreme authority to make laws for the right government of the State; but no legislature can curtail the power of its successors to make

such laws as they may deem proper in matters of police'. . . . No one denies . . . that [this legislative power] extends to all matters affecting the public health or the public morals."

Later cases continued to read the Contract Clause as qualified by the States' powers to legislate for the betterment of their citizens, while further expanding the range of permissible police powers. For example, in *Atlantic Coast Line R. Co.* v. *Goldsboro,* 232 U. S. 548 (1914), the State chartered and contracted with the plaintiff railway company to operate rail lines within the State. Pursuant to this contract, the railroad acquired in fee land for use as rights-of-way and similar transportation activities. The Court recognized that the charter was a binding contract, and that the company, in reliance on the agreement, had acquired land which it enjoys as "complete and unqualified" owner. *Id.,* at 556, 558. Yet, the Court brushed aside a constitutional challenge to subsequent ordinances that greatly circumscribed the railroad's activities on its own land:

"For it is settled that neither the 'contract' clause nor the 'due process' clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise." *Id.,* at 558.

In perfect conformity with these earlier cases that recognized the States' broad authority to legislate for the welfare of their citizens, New Jersey and New York sought to repeal the 1962 covenant in furtherance of "admittedly important" interests, *ante,* at 29, in environmental protection, clean air, and safe and efficient transportation facilities. The States' policy of deploying excess tolls for the maintenance and ex-

pansion of rapid transit was not oppressively or capriciously chosen; rather, it squarely complies with the commands embodied by Congress in several contemporaneous national laws. *Supra,* at 36–37. By invalidating the 1974 New Jersey repeal—and, by necessity, like action by New York—the Court regrettably departs from the virtually unbroken line of our cases that remained true to the principle that all private rights of property, even if acquired through contract with the State, are subordinated to reasonable exercises of the States' lawmaking powers in the areas of health (*Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659 (1878); *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746 (1884)); environmental protection (*Hudson Water Co.* v. *McCarter,* 209 U. S. 349 (1908); *Manigault* v. *Springs,* 199 U. S. 473 (1905); cf. *Henderson Co.* v. *Thompson,* 300 U. S. 258, 267 (1937); *Illinois Central R. Co.* v. *Illinois,* 146 U. S. 387, 452–453 (1892)); and transportation (*New Orleans Pub. Serv.* v. *New Orleans,* 281 U. S. 682 (1930); *Erie R. Co.* v. *Public Util. Comm'rs,* 254 U. S. 394 (1921); *Denver & R. G. R. Co.* v. *Denver,* 250 U. S. 241 (1919); *Atlantic Coast Line R. Co.* v. *Goldsboro, supra; Northern Pac. R. Co.* v. *Duluth,* 208 U. S. 583 (1908); *Chicago, B. & Q. R. Co.* v. *Nebraska ex rel. Omaha,* 170 U. S. 57 (1898); *New York & N. E. R. Co.* v. *Bristol,* 151 U. S. 556 (1894)). In its disregard of these teachings, the Court treats New Jersey's social and economic policies with lesser sensitivity than former Members of this Court who stressed the protection of contract and property rights. Even Mr. Justice Butler recognized that the Contract Clause does not interfere with state legislative efforts in behalf of its citizens' welfare unless such actions

"are . . . clearly unreasonable and arbitrary . . . . [And in applying this standard] [u]ndoubtedly the city, acting as the arm of the State, has a wide discretion in determining what precautions in the public interest are necessary or appropriate under the circumstances." *New Orleans Pub. Serv., supra,* at 686.

Thus, with at best a passing nod to the long history of judicial deference to state lawmaking in the face of challenges under the Contract Clause, see *ante,* at 23 n. 20, the Court today imposes severe substantive restraints on New Jersey's attempt to free itself from a contractual provision that it deems inconsistent with the broader interests of its citizens. Today's decision cannot be harmonized with our earlier cases by the simple expedient of labeling the covenant "purely financial," *ante,* at 25, rather than a forfeiture of "an essential attribute of [New Jersey's] sovereignty," *ante,* at 23. As either an analytical or practical matter, this distinction is illusory. It rests upon an analytical foundation that has long been discarded as unhelpful.[15] And as a

---

[15] Among other difficulties, the question-begging attempt to categorize inviolable legislation powers vis-à-vis the Contract Clause depends upon a conception of state sovereignty that is both simplistic and unpersuasive. We are told that the Contract Clause "does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty," *ante,* at 23, but in applying this principle, the Court finds that the States' "taxing and spending powers," unlike the power of eminent domain, lie outside this rule, *ante,* at 24. Before today, one might well have supposed that the States' authority to tax, spend money, and generally make basic financial decisions is among the most important of their governmental powers. Indeed, only last Term, this Court announced that a State's decision to pay its employees less than the minimum wage—a decision of far less importance to the citizens generally than efforts to derive funding for improving the facilities that directly and vitally affect their health and safety—is immune from federal regulation under the Commerce Clause, an authority previously thought to be virtually plenary in nature. The Court there reasoned that the minimum-wage decision falls within the sovereign powers of "States *qua* States." *National League of Cities* v. *Usery,* 426 U. S. 833, 847 (1976). One may rightfully feel unease that the Court is in the process of developing a concept of state sovereignty that is marked neither by consistency nor intuitive appeal.

In any event, in addition to resting on a most dubious conception of sovereignty, the Court's effort to demonstrate that the States are free to contract away their taxing and spending powers—and hence free "to enter into effective financial contracts" notwithstanding later exercises of the police power—must fail because it is untenable. While it is true that

purely practical matter, an interference with state policy is no less intrusive because a contract prohibits the State from resorting to the most realistic and effective financial method of preserving its citizens' legitimate interests in healthy and safe transportation systems rather than directly proscribing the States from exercising their police powers in this area. The day has long since passed when analysis under the Contract Clause usefully can turn on such formalistic differences. Cf. *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 438 (1934).

Nor is the Court's reading of earlier constitutional doctrine aided by cases where the Contract Clause was held to forestall state efforts intentionally to withhold from creditors the unpaid interest on, *Von Hoffman* v. *City of Quincy,* 4 Wall. 535 (1867), or principal of, *Louisiana ex rel. Hubert* v. *New Orleans,* 215 U. S. 170 (1909); *Wolff* v. *New Orleans,* 103 U. S. 358 (1881), outstanding bonded indebtedness. Beyond dispute, the Contract Clause has come to prohibit a State from embarking on a policy motivated by a simple desire to escape its financial obligations or to injure others through "the repudiation of debts or the destruction of contracts or the denial of means to enforce them." *Home Bldg. & Loan Assn.* v. *Blaisdell, supra,* at 439. Nor will the Constitution permit

New Jersey v. Wilson, 7 Cranch 164 (1812) (Contract Clause precludes a legislature from repudiating a grant of tax exemption) has never explicitly been overruled, subsequent cases have almost uniformly avoided adherence to either its reasoning or holding. See, *e. g., New York ex rel. Clyde* v. *Gilchrist,* 262 U. S. 94 (1923); *Seton Hall College* v. *South Orange,* 242 U. S. 100 (1916); *Rochester R. Co.* v. *Rochester,* 205 U. S. 236 (1907); *Wisconsin & M. R. Co.* v. *Powers,* 191 U. S. 379 (1903); *Morgan* v. *Louisiana,* 93 U. S. 217 (1876). These cases appreciate, as today's decision does not, that the operative consideration for constitutional purposes is not whether a contract can or cannot be branded as "financial." Rather, in adjudging the constitutionality of "an exercise of the sovereign authority of the State," *Seton Hall College, supra,* at 106—be it financial or otherwise—the Contract Clause tolerates reasonable legislative Acts in the service of the broader interests of the society generally.

a State recklessly to pursue its legitimate policies involving matters of health, safety, and the like with "studied indifference to the interests of the mortgagee or to his appropriate protection . . . ." *W. B. Worthen Co.* v. *Kavanaugh,* 295 U. S. 56, 60 (1935). In this regard, the Court merely creates its own straw man when it characterizes the choice facing it today either as adopting its new, expansive view of the scope of the Contract Clause, or holding that the Clause "would provide no protection at all." *Ante,* at 26. The Constitution properly prohibits New Jersey and all States from disadvantaging their creditors without reasonable justification or in a spirit of oppression, and New Jersey claims no such prerogatives. But if a State, as here, manifestly acts in furtherance of its citizens' general welfare, and its choice of policy, even though infringing contract rights, is not "plainly unreasonable and arbitrary," *Denver & R. G. R. Co.* v. *Denver,* 250 U. S., at 244, our inquiry should end:

> "The question is . . . whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end." *Home Bldg. & Loan Assn.* v. *Blaisdell, supra,* at 438.

The Court, however, stands the Contract Clause completely on its head, see *supra,* at 45, and both formulates and strictly applies a novel standard for reviewing a State's attempt to relieve its citizens from unduly harsh contracts entered into by earlier legislators: [16] Such "an impairment may be con-

---

[16] The Court makes clear that it contemplates stricter judicial review under the Contract Clause when the government's own obligations are in issue, but points to no case in support of this multiheaded view of the scope of the Clause. See *ante,* at 25–26. As noted previously, see n. 13, *supra,* this position finds no support in the historical rationale for inclusion of the Contract Clause in the Constitution. And it is clear that the Court's citation to *Perry* v. *United States,* 294 U. S. 330 (1935), see *ante,* at 26 n. 25, offers no support for its rewriting of history. In that case, one of the *Gold Clause Cases,* Perry challenged the constitution-

stitutional if it is reasonable and necessary to serve an important public purpose." *Ante,* at 25. Not only is this apparently spontaneous formulation virtually assured of frustrating the understanding of court and litigant alike,[17] but it

ality of a congressional enactment which authorized the redemption of outstanding United States gold bonds by payment of legal tender currency rather than " 'by the payment of 10,000 gold dollars each containing 25.8 grains of gold, .9 fine,' " 294 U. S., at 347, the value of the dollar in gold when the bonds were acquired. Perry complained that inflation had devalued the worth of legal tender with respect to gold and, therefore, claimed financial injury by the conversion. The Government defended its actions on the ground that the gold clause obstructed Congress' express power to "regulate the Value" of money, Art. I, § 8, and, accordingly, argued that Congress was free to repudiate the gold standard under that power. Although Perry ultimately was denied recovery, the Court found that the authority to "regulate the Value" of money, while permitting Congress "to control or interdict the contracts of private parties" with regard to the legal exchange rate, 294 U. S., at 350, did not include the power to repudiate the Government's own obligations, which were governed by entirely different constitutional provisions: *E. g.,* Congress may "borrow Money on the credit of the United States," Art. I, § 8, cl. 2, and "The validity of the public debt of the United States . . . shall not be questioned," Amdt. 14, § 4. Thus the differential standard in *Perry* emerged from the collision of competing grants of power to the Federal Government, and did not purport to suggest that the Contract Clause—or its federal counterpart, the Fifth Amendment—standing alone would produce different standards for reviewing governmental interference with public and private contractual obligations.

[17] The Court's newly announced standard of review, like all such formulations, can merely hope to suggest the direction that a court's inquiry should take, and the relative weight to be afforded a constitutional right. But particular words like "reasonable" and "necessary" also are fused with special meaning, for judges have long experience in applying such standards to constitutional contexts. Reasonableness generally has signified the most relaxed regime of judicial inquiry. See, *e. g., Dandridge* v. *Williams,* 397 U. S. 471, 485 (1970) ("If the classification has some 'reasonable basis,' it does not offend the Constitution"). Contrariwise, the element of necessity traditionally has played a key role in the most penetrating mode of constitutional review. See *e. g., Shapiro* v. *Thompson,* 394 U. S. 618, 634 (1969) (a classification which burdens

is wholly out of step with the modern attempts of this Court to define the reach of the Contract Clause when a State's own contractual obligations are placed in issue.

Mr. Justice Cardozo's opinion in *W. B. Worthen Co.* v. *Kavanaugh*, 295 U. S. 56 (1935), is the prime exposition of the

---

a fundamental constitutional right must be "necessary to promote a *compelling* governmental interest"). The Court's new test, therefore, represents a most unusual hybrid which manages to merge the two polar extremes of judicial intervention, see generally Gunther, Foreword: In Search of Evolving Doctrine on A Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1, 8 (1972), into one synthesis. Plainly, courts are apt to face considerable confusion in wielding such a schizophrenic new instrument. And well they might, for until today one would have fairly thought that as a matter of common sense as well as doctrine, state policies that are "necessary to serve an important public purpose," *ante,* at 25, *a fortiori* would be "reasonable."

The Court, however, seems to discover new meanings in these terms. "Necessary" appears to comport with some notion of a less restrictive alternative. As applied by the Court in this instance, however, the less restrictive alternative bears no relationship to previous uses of that analytical tool when economic and social matters were involved. Thus, the Court does not actually inquire whether "the government can achieve the purposes of the challenged regulation equally effectively by one or more narrower regulations." Struve, The Less-Restrictive-Alternative Principle and Economic Due Process, 80 Harv. L. Rev. 1463 (1967). Rather, the Court concludes that an impairment of contract was not "necessary" because the Court apparently is able to hypothesize other means of achieving some or all of the State's objectives, even though these alternatives have long been deemed as secondary in importance, nn. 7, 8, *supra,* or arguably are unconstitutional, *ante,* at 30 n. 28. Under this approach, few, if any, Contract Clause cases in history that have deferred to state policymaking have been correctly decided. See *infra,* at 59.

The "reasonableness" test does no better. No longer does it mean that this Court will defer to the "reasonable judgments" of the authorized policymakers. *Knebel* v. *Hein,* 429 U. S. 288, 297 (1977). Instead, the Court appears to ask whether changed circumstances took the state legislature by surprise, *ante,* at 31–32. Again, I find no basis in this Court's prior cases for adopting such a constrictive view of that constitutional test. See *infra,* at 59–60.

modern view. As a relief measure for financially depressed local governments, Arkansas enacted a statute that greatly diminished the remedies available to creditors under their bonds. This resulted in a remedial scheme whereby creditors were "without an effective remedy" for a minimum of 6½ years, during which time the government's obligation to pay principal or interest was suspended. *Id.*, at 61. The Court invalidated the alteration in remedies. It did so, however, only after concluding that the challenged state law cut recklessly and excessively into the value of the creditors' bonds: "[W]ith studied indifference to the interests of the mortgagee or to his appropriate protection [the State has] taken from the mortgage the quality of an acceptable investment for a rational investor." *Id.*, at 60. "So viewed [the State's action is] seen to be an oppressive and unnecessary destruction of nearly all the incidents that give attractiveness and value to collateral security." *Id.*, at 62.

In the present case, the trial court expressly applied the *Kavanaugh* standard to New Jersey's repeal of the covenant, and properly found appellant's claim to be wanting in all material respects: In a detailed and persuasive discussion, the court concluded that neither New Jersey nor New York repealed the covenant with the intention of damaging their creditors' financial position. Rather, the States acted out of "vital interest[s]," for "[t]he passage of time and events between 1962 and 1974 satisfied the Legislatures of the two states that the public interest which the Port Authority was intended to serve could not be met within the terms of the covenant." 134 N. J. Super., at 194, 338 A. 2d, at 873. And the creditors' corresponding injury did not even remotely reach that proscribed in *Kavanaugh:* Not only have Authority bonds remained "an 'acceptable investment,'" but "[t]he claim that bondholder security has been materially impaired or destroyed by the repeal is simply not supported by the record." *Id.*, at 196, 338 A. 2d, at 874.

The Court, as I read today's opinion, does not hold that

the trial court erred in its application of the facts of this case to Mr. Justice Cardozo's formulation. Instead, it manages to take refuge in the fact that *Kavanaugh* left open the possibility that the test it enunciated may merely represent the " 'outermost limits' " of state authority. *Ante,* at 27. This, I submit, is a slender thread upon which to hang a belated revival of the Contract Clause some 40 years later. And, in any event, whatever opening remained after *Kavanaugh* was surely closed by Mr. Justice Frankfurter in *Faitoute Iron & Steel Co.* v. *City of Asbury Park,* 316 U. S. 502 (1942). Speaking for a unanimous Court, *id.,* at 515, he employed the precise constitutional standard established by Mr. Justice Cardozo seven years earlier, and upheld under the Contract Clause a New Jersey plan to reorganize the outstanding debt obligations held by creditors of Asbury Park. The Court thereby authorized an impairment of creditors' financial interests that was far more substantial than that involved here: In fact, the reorganization plan both extended the maturity date of the city's bonds by some 30 years and reduced the relevant coupon rate. Yet, rather than suggesting, as does the Court today, that New Jersey possessed lesser authority in the public interest to amend its own contracts than to alter private undertakings, the Court made clear that the State's powers are more expansive

> "[w]here . . . the respective parties are not private persons . . . but are persons or corporations whose rights and powers were created for public purposes, by legislative acts, and where the subject-matter of the contract is one which affects the safety and welfare of the public." *Id.,* at 514 n. 2, quoting *Chicago, B. & Q. R. Co.* v. *Nebraska,* 170 U. S., at 72.

In my view, the fact that New Jersey's repeal of the 1962 covenant satisfies the constitutional standards defined in *Kavanaugh* and *Faitoute* should, as the state courts concluded, terminate this litigation. But even were I to agree that the test

in *Kavanaugh* remains open to further refinement, that, I re-
peat, would hardly justify the Court's attempt to deploy the
Contract Clause as an apparently unyielding instrument for
policing the policies of New Jersey and New York.   For such
an interpretation plainly is at odds with the principles articu-
lated in *Kavanaugh* and *Faitoute,* and subsequently recon-
firmed by *El Paso* v. *Simmons,* 379 U. S. 497 (1965).   The
Court there considered a provision of Texas law that abolished
an unlimited redemption period for landowners whose land had
been defaulted to the State for nonpayment of interest, sub-
stituting a 5-year reinstatement period in its place.   Unlike
appellant here, Simmons at least could claim to have suffered
tangible economic injury by virtue of the State's modification
of his land-sale contract; indeed, as a result of that "impair-
ment" he permanently lost property to the State.   And, of
course, Texas' "self-interest [was] at stake," *ante,* at 26, since
it alone was the beneficiary of Simmons' curtailed right of rein-
statement.   Yet, properly applying the teachings of *Blaisdell,*
*Kavanaugh,* and *Faitoute,* the Court had little difficulty in
sustaining the measure as a means of removing clouds on
title arising from pending reinstatement rights, 379 U. S., at
508–509 (citations omitted):

> "The *Blaisdell* opinion, which amounted to a comprehen-
> sive restatement of the principles underlying the appli-
> cation of the Contract Clause, makes it quite clear that
> '[n]ot only is the constitutional provision qualified by the
> measure of control which the State retains over remedial
> processes, but the State also continues to possess author-
> ity to safeguard the vital interests of its people.   It does
> not matter that legislation appropriate to that end "has
> the result of modifying or abrogating contracts already in
> effect." . . .'   'Once we are in this domain of the reserve
> power of a State we must respect the "wide discretion on
> the part of the legislature in determining what is and
> what is not necessary." ' "

It need hardly be said that today's decision is markedly out of step with this deferential philosophy. The Court's willingness to uphold an impairment of contract—no matter how "technical" the injury—only on a showing of "necessity" *ante,* at 29–31, is particularly distressing, for this Court always will be able to devise abstract alternatives to the concrete action actually taken by a State. For example, in virtually every decided Contract Clause case, the government could have exercised the Court's "lesser alternative" of resorting to its powers of taxation as a substitute for modifying overly restrictive contracts. *Ante,* at 30 n. 29. Nothing, at least on the level of abstraction and conjecture engaged in by the Court today, prevented the appropriation of monies by Illinois to buy back or modify the corporate charter of the polluting fertilizer company in *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659 (1878); or by New Jersey to ensure the financial solvency of Asbury Park bonds, *Faitoute Iron & Steel Co.* v. *City of Asbury Park, supra;* or by Texas to purchase the unlimited redemption rights involved in *El Paso* v. *Simmons, supra.* Yet, in all these cases, modifications of state contracts were countenanced, and this Court did not feel compelled or qualified to instruct the state legislatures how best to pursue their business. In brief, these cases recognized that when economic matters are concerned, "the availability of alternatives does not render the [decisionmaker's] choice invalid." *Knebel* v. *Hein,* 429 U. S. 288, 294 (1977). State legislation "may not be held unconstitutional simply because a court finds it unnecessary, in whole or in part." *Whalen* v. *Roe,* 429 U. S. 589, 597 (1977).

By the same token, if unforeseeability is the key to a "reasonable" decision, as the Court now contends, *ante,* at 32, almost all prior cases again must be repudiated. Surely the legislators of Illinois could not convincingly have claimed surprise because a fertilizer company polluted the air and transported fertilizer to its factory, *Fertilizing Co.* v. *Hyde*

*Park, supra.* Nor was it unforeseeable to Mississippi that a corporation which was expressly chartered to operate a lottery, in fact, did so, *Stone* v. *Mississippi,* 101 U. S. 814 (1880). And, of course, it was "not unknown," *ante,* at 32, to either debtor or creditor that a municipality's financial condition might falter as in *Faitoute Iron & Steel Co.* v. *City of Asbury Park, supra;* indeed, the foreseeability of that very risk inheres in the process of selecting an appropriate coupon rate. Yet, in all of these instances this Court did not construe the Contract Clause to prevent the States from confronting their real problems if and when their legislators came to believe that such action was warranted. It is not our province to contest the "reasonable judgments" of the duly authorized decisionmakers. *Knebel* v. *Hein, supra,* at 297.

Thus, as I had occasion to remark only last Term, the Court again offers a constitutional analysis that rests upon "abstraction[s] without substance," *National League of Cities* v. *Usery,* 426 U. S. 833, 860 (1976) (dissenting opinion). Given that this is the first case in some 40 years in which this Court has seen fit to invalidate purely economic and social legislation on the strength of the Contract Clause, one may only hope that it will prove a rare phenomenon, turning on the Court's particularized appraisal of the facts before it. But there also is reason for broader concern. It is worth remembering that there is nothing sacrosanct about a contract. All property rights, no less than a contract, are rooted in certain "expectations" about the sanctity of one's right of ownership. Compare *ante,* at 19–21, n. 17, with J. Bentham, Theory of Legislation c. 8 (1911 ed.). And other constitutional doctrines are akin to the Contract Clause in directing their protections to the property interests of private parties. Hence the command of the Fifth Amendment that "private property [shall not] be taken for public use, without just compensation" also "remains a part of our written Constitution." *Ante,* at 16. And during the heyday of economic due process associated with *Lochner* v. *New*

*York,* 198 U. S. 45 (1905), and similar cases long since discarded, see *Whalen* v. *Roe, supra,* at 597, this Court treated "the liberty of contract" under the Due Process Clause as virtually indistinguishable from the Contract Clause. G. Gunther Constitutional Law, 603–604 (1975); Hale, The Supreme Court and the Contract Clause: III, 57 Harv. L. Rev. 852, 890–891 (1944). In more recent times, however, the Court wisely has come to embrace a coherent, unified interpretation of all such constitutional provisions, and has granted wide latitude to "a valid exercise of [the States'] police powers," *Goldblatt* v. *Hempstead,* 369 U. S. 590, 592 (1962), even if it results in severe violations of property rights. See *Pittsburgh* v. *Alco Parking Corp.,* 417 U. S. 369 (1974); *Sproles* v. *Binford,* 286 U. S. 374, 388–389 (1932); *Miller* v. *Schoene,* 276 U. S. 272, 279–280 (1928); cf. *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 488 (1955). If today's case signals a return to substantive constitutional review of States' policies, and a new resolve to protect property owners whose interest or circumstances may happen to appeal to Members of this Court, then more than the citizens of New Jersey and New York will be the losers.

## III

I would not want to be read as suggesting that the States should blithely proceed down the path of repudiating their obligations, financial or otherwise. Their credibility in the credit market obviously is highly dependent on exercising their vast lawmaking powers with self-restraint and discipline, and I, for one, have little doubt that few, if any, jurisdictions would choose to use their authority "so foolish[ly] as to kill a goose that lays golden eggs for them," *Erie R. Co.* v. *Public Util. Comm'rs,* 254 U. S., at 410. But in the final analysis, there is no reason to doubt that appellant's financial welfare is being adequately policed by the political processes and the

bond marketplace itself.[18]   The role to be played by the Constitution is at most a limited one.   *Supra,* at 52–53.   For this Court should have learned long ago that the Constitution—be it through the Contract or Due Process Clause—can actively intrude into such economic and policy matters only if my Brethren are prepared to bear enormous institutional and social costs.   Because I consider the potential dangers of such judicial interference to be intolerable, I dissent.

---

[18] And, of course, there is every reason to expect that appellant, with combined trust and fiduciary holdings of Authority bonds amounting to some $300 million, is not powerless in protecting its interests either before the state legislature or in the economic marketplace.   Indeed, a myriad of sophisticated investors, investment banks, and market analysts regularly oversee the operation of the bond market and the affairs of municipalities which appear in search of credit.   Accordingly, any city or State that enters the marketplace is well aware that, should it treat its creditors abusively, the market is apt to exact "justice" that is quicker and surer than anything that this Court can hope to offer.   In brief, appellant is the paradigm of a litigant who is neither "discrete" nor "insular" in appealing for this Court's time or protection.