UNITED STATES of America, Plaintiff and Counter-Defendant,

v.

STATE OF MICHIGAN, Defendant, Cross-Plaintiff and Cross-Defendant,

v.

CITY OF DETROIT, a Municipal Corporation, and Detroit Water and Sewerage Department, Defendant and Cross-Plaintiff,

v.

ALL COMMUNITIES AND AGENCIES UNDER CONTRACT WITH the CITY OF DETROIT FOR SEWAGE TREATMENT SERVICES

v.

The DETROIT AREA LAUNDRY POLLUTION CONTROL GROUP, a Voluntary, Nonprofit, Unincorporated Association, and Its Members, on its own behalf and on behalf of all those other Commercial, Industrial and Linen Laundries similarly situated who are served by the Detroit Water and Sewerage Department

v.

The FOOD AND ALLIED INDUSTRIES COMMITTEE OF METROPOLITAN DETROIT, a Voluntary, Nonprofit, Unincorporated Association, and Its Members, Intervening Rate Challengers.

Civ. A. No. 77–71100.

United States District Court, E. D. Michigan, S. D.

July 9, 1981.

Richard A. Rossman, U.S. Atty., Detroit, Mich., for United States of America.

Thomas Emery, Asst. Atty. Gen., Lansing, Mich., for State of Michigan.

Darryl F. Alexander, Asst. Corporate Counsel, City of Detroit, Richard J. McClear, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for City of Detroit.

William P. Hampton, Davidson, Gotshall, Kohl, Secrest, Wardle, Lynch & Clark, Farmington Hills, Mich., for Oakland County Drain Commissioner.

John E. Breen, Wayne County Board of Public Works, Detroit, Mich., for Wayne County.

James A. Smith, Bodman, Longley & Dahling, Detroit, Mich., for Macomb County.

OPINION REGARDING THE APPLICA-
TION OF THE ADDITIONAL BONDS
TEST TO RATE CALCULATIONS
FOR FISCAL YEAR 1981–82

FEIKENS, District Judge.

The Detroit Water and Sewerage Department ("DWSD") finances major capital improvements to its wastewater treatment plant and system through the issuance of revenue bonds. The bonds are not a general obligation of the City of Detroit ("Detroit"), hence the principal and interest are paid solely from the revenues of the system. Fiscal year ("FY") 1981–82 wastewater treatment rates of DWSD have been challenged by various suburban communities and other interest groups. The challenge of concern here is the effect of bond financing on the rates. During the course of pretrial status conferences, it was agreed among the parties that this issue is ripe for resolution.

The dispute is whether investment income of the wastewater system is included in a determination of revenues and whether operation and maintenance ("O&M") expense in a future year (not incurred in the fiscal rate year) for capital improvements financed by a bond issue should be deducted from the revenues of the system. The answer to these questions affects the calculation of user rates because additional bonds cannot be issued unless the system's "net revenues [are] equal to at least one and one-half (1½) times the largest amount of combined principal and interest to fall due in any future operating year on any bonds then payable out of the net revenues of the system." City of Detroit Ordinance 517–E, § 19 (November 7, 1950). This is a case of first impression and the answers must be found in the statute and ordinances.

The issuance of bonds is governed by the "Revenue Bond Act", M.C.L.A. § 141.101 *et seq.* The Act provides that additional bonds may be issued as long as they have equal standing with those bonds first issued for the public improvement. M.C.L.A. § 141.119. City of Detroit Ordinance 517–E, § 19 defines the criteria for the issuance of additional bonds:

The right is reserved ... to issue additional bonds payable from the revenues of the System which shall be of equal standing with the bonds herein authorized, provided, however, that no such additional bonds shall be issued unless the estimated net revenues shall be equal to at least one and one-half (1½) times the largest amount of combined principal and interest to fall due in any future operating year on any bonds then payable out of the net revenues of the System, including such additional bonds then being issued.

The test of the estimated net revenues is commonly referred to as the "coverage" test and it provides a further measure of protection to bondholders to insure sufficient income for payment on the bond indebtedness. The rate challengers contend that inclusion of future * operation and maintenance expense in computing system revenues and the exclusion of investment income from system revenues levy an unnecessary and increased rate on current users of the wastewater system.

I.

DWSD has informed the Court and the parties that estimates of operation and maintenance expense to be incurred beyond FY 1981–82, and which result from the addition of capital improvements financed by revenue bonds, will be included in the rate computation for FY 1981–82. DWSD contends that these estimates are mandated by the additional bonds test, since the estimated net revenues must be at least 1.5 times the maximum future debt service in *any* future operating year and that proper coverage, therefore, can only be computed by projecting the amount of principal and interest due throughout the terms of the bond issue. The coverage test requires net revenues to exceed 1.5 times the maximum debt service. The term "Net revenues" as defined in Ordinance 517–E incorporates the statutory definition of the Revenue Bond Act:

* not incurred in FY 1981–82.

Net revenues means the revenues of a public improvement remaining after deducting the reasonable expenses of administration, operation, and maintenance of the public improvement.

M.C.L.A. § 141.103(g). Therefore, the O&M expense for the year in which the maximum debt service is due must be estimated to calculate the net revenues. The coverage test must then be met by those net revenues. DWSD argues that the net revenues necessary to meet the coverage test must be generated in the year that the bonds are sold in order to meet its obligation to its bondholders. Hence it argues that the rates for FY 1981–82 must be set so as to generate sufficient net revenues to meet the coverage test for the year of maximum debt service plus O&M expense for facilities that have not yet been built.

I disagree. Neither the Revenue Bond Act nor the City Ordinance specifically requires incorporation of O&M expense not incurred in FY 1981–82 in the computation of rates. It is illogical to deduce, without express language providing otherwise, that users of the wastewater system during FY 1981–82 must pay for expenses not incurred in that year. Yet this is precisely the result if DWSD were permitted to factor future O&M expense into the rate equation. The rates levied on users during a fiscal year should reflect only those expenses that are anticipated to be incurred by the system during that year.

This is not to say that O&M expenses in future fiscal years should be ignored. The additional bonds test is intended to provide a fifty per cent (50%) cushion to the amount of principal and interest due during a single year. However, more equitable means exist to provide the requisite cushion for future years. For example, DWSD presently could calculate rates to be implemented in future fiscal years that would provide stepwise increases to reflect the increased O&M expense due to capital improvements built in that year, increased costs, and other factors. Alternatively, DWSD could elect to negotiate rates annually for which data regarding projected O&M expense for that year would be readily available. In any instance, DWSD should not be permitted to assess a rate as it proposes in FY 1981–82. Incorporation of O&M expense not incurred in FY 1981–82 will create a surplus of excess capital that is unjustified by present planned projects. It is also contrary to the notion that public projects should not create profits through excessive rates to its users. Furthermore, present users may never utilize the improvements for which the current rates would be assessed if future O&M expense was incorporated into the rates. Such practice is inconsistent with the sound public policy that justifies state projects bonded and implemented pursuant to the police power.

I conclude that DWSD must eliminate O&M expense to be incurred in future fiscal years from the calculations for the additional bonds coverage test.

## II.

The second challenge made to the DWSD rates in FY 1981–82 concerns the exclusion of investment income from the calculation of revenue and, concomitantly, net revenues when the coverage test is calculated. The principal argument raised by DWSD is that investment income was not included within the definition of "revenue" in the Revenue Bond Act until 1978. Thus, inclusion of the income to calculate present and prospective rates would impair contracts with its existing bondholders who did not rely on this factor as contributing to the 50% cushion. DWSD further contends that investment income is not dependable and thus makes it difficult to calculate future rates. The corollary to that argument is that this type of income cannot be a sufficient basis on which to issue more bonds. Finally it is argued that the value of the outstanding bondholders' bonds would be decreased because they would share in the available revenues with a larger principal amount of bonds.

In 1978 the Michigan legislature amended the definition of "revenues" in the Revenue Bond Act so as to provide that:

"Revenues" means the income derived from the rates charged for the services, facilities, and commodities furnished by a public improvement. Revenues shall include, to the extent provided in the authorizing ordinance, earnings on investment of funds of the public improvement and other revenues derived from or pledged to operation of the public improvement.

M.C.L.A. § 141.103(f). The definition broadened the scope of the term "revenues" and was a "liberalizing" amendment. The question to be determined as to the contention of impairment of contract is the effect that this amendment has on bonds issued prior to 1978.

There is no legislative history to these provisions to assist in the explanation of legislative intent. Yet it is obvious to me that the amendment was meant to apply to *all* revenue bonds, including those issued prior to the date of the amendment, unless otherwise provided in the authorizing ordinance. I so conclude because to do otherwise would require DWSD to retire all previous bonds entirely before it could exercise the advantage provided by the amendment or risk issuance of bonds that would not be of equal standing to those earlier issued, thus violating M.C.L.A. § 141.119, the additional bonds provision previously discussed. It is illogical to presume that the legislature would provide a liberal interpretation of revenue while precluding its use through another section of the same Act that requires equal standing among previous and additional bonds.

In this light, it would appear that the legislature was only clarifying a definition that was thought to have included income from investments as a matter of course. Again, like the result of the incorporation of O&M expense in future fiscal years in the calculation of net revenues for the coverage test, exclusion of investment income from revenues would create a surplus for the wastewater system. Although the investment income is not technically derived from investment of revenues derived from rates, the rates are directly affected by the inclusion of investment income in the revenues. Bonds are sold to finance capital improvements and not to enable the system to profit financially from their sale. If excess revenue would result from the incorporation of investment income, DWSD can either decrease the rates or decrease the amount of the bond issue.

The argument that the outstanding bondholders' bonds have a decreased value when investment income is included in net revenues is without merit. The Revenue Bond Act provides that all bonds shall be payable from all the net revenues derived from the operation of the system and that all bondholders have a statutory lien on the net revenues. M.C.L.A. §§ 141.107, 141.109. The lien extends to income on investments according to the statutory definitions set forth in M.C.L.A. § 141.103(f), (g) and described above. Therefore, all bondholders are subject to the same security in the event that the system does not retire the bond principal and interest due in a given year. Indeed, implicit in the notion of parity and equal standing of additional bonds is the equality of security in the net revenues of the system in such an event.

DWSD contends that application of the 1978 definition of revenues to include investment income violates the Contract Clause of the United States Constitution, Article I, § 9, cl. 3, and the Michigan Constitution, Article I, § 10. In support of its position, DWSD cites *United States Trust Company of New York v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), a case in which the Port Authority of New York and New Jersey issued bonds pursuant to a statutory agreement. The agreement provided that the annual operating deficit of the railroads for which the revenue bonds were sold could not exceed one-tenth of one per cent of the total bonded debt of the Port Authority. Subsequent to the bond issue, the statute was repealed. The principle of that case, however, can be distinguished from the inclusion of investment income in the coverage test by DWSD. The 1978 provision permitting investment income to be included in revenues

does not rescind any material provision of the contract to bondholders, nor does it modify any provision affecting the purpose of extent of the bond issue. Instead, it merely expands the means by which bondholders are protected in their investment, a means that previously existed but was not specifically articulated in the statute prior to 1978.

DWSD notes that the Official Statement accompanying the 1980 bonds specifically excludes investment income from the calculation of net revenues to meet the coverage test. Although the Revenue Bond Act definition provides for such an inclusion through the authorizing ordinance for the bond sale, the ordinance itself only provides for issuance of bonds of equal standing and parity of lien as to the revenues of the system with previously issued bonds. City of Detroit Ordinance 407–H, § 7 (November 5, 1980). Furthermore, exclusion of investment income such as is provided by the 1980 Official Statement is a violation of the 1978 Rate Settlement Agreement entered into by the parties in this case on July 19, 1978. Paragraph 5B of that agreement provides:

Maximum Debt Financing. *Detroit shall obtain capital funds* for the expansion, renewal and reconstruction of common use or solely suburban use major capital assets or improvements *from the issuance of revenue bonds, to the maximum extent possible together with maximum use of coverage monies generated thereby.*

(Emphasis added). Failure to use the investment income in the coverage test is a violation of the rate agreement since it does not maximize the use of money generated by the issuance of revenue bonds. Deliberate exclusion of the investment income from the coverage test, as provided in the 1980 Official Statement, is a deliberate violation of the 1978 Rate Agreement.

I conclude that DWSD must include investment income as revenue in the calculations for the additional bonds coverage test.

An order so providing should be submitted.