Burns v Burns (2018 NY Slip Op 05411)





Burns v Burns


2018 NY Slip Op 05411


Decided on July 25, 2018


Appellate Division, Fourth Department


NeMoyer, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 25, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CENTRA, J.P., NEMOYER, CURRAN, AND TROUTMAN, JJ.


399 CA 17-01854

[*1]ELEANOR MCQUILKIN BURNS, PLAINTIFF-APPELLANT,
v
ANDREW MCINTOSH BURNS, DEFENDANT-RESPONDENT. 






BARNEY & AFFRONTI, LLP, ROCHESTER (FRANCIS C. AFFRONTI OF COUNSEL), FOR PLAINTIFF-APPELLANT.
BURNS & SCHULTZ LLP, PITTSFORD (ANDREW M. BURNS OF COUNSEL), FOR DEFENDANT-RESPONDENT. 


NeMoyer, J.
 Appeal from an order of the Supreme Court, Monroe County (Richard A. Dollinger, A.J.), entered June 13, 2017. The order, among other things, denied plaintiff's motion to hold defendant in contempt. 
It is hereby ORDERED that the order so appealed from is unanimously affirmed without costs.
Opinion by NeMoyer, J.:
According to the Domestic Relations Law and its common-law antecedents, the concept of spousal maintenance is limited to payments made to an unmarried ex-spouse. If divorcing spouses wish to vary this definition and provide for post-remarriage maintenance, they must do so clearly and unambiguously. In this case, nothing in the parties' agreement reflects an intent to depart from the statutory definition of maintenance with the clarity required by the governing caselaw. Consequently, as Supreme Court properly determined, defendant husband's maintenance obligation ended when plaintiff wife remarried.
FACTS
The parties were married in June 1992. In September 2004, the husband vacated the marital residence; shortly thereafter, the wife sued for divorce. The parties subsequently executed a divorce settlement agreement pursuant to Domestic Relations Law § 236 (B) (3). In the agreement, the parties specified that "[a]ll matters affecting interpretation of this [a]greement and the rights of the parties [t]hereto shall be governed by the laws of the State of New York."
The agreement obligated the husband to pay "rehabilitative maintenance" to the wife pursuant to the following schedule:
"(a) From December 1, 2007 - November 30, 2012: $5,500.00 Per Month = $66,000.00 Rehabilitative Maintenance Per Annum
(b) From December 1, 2012 - November 30, 2014: $2,916.00 Per Month = $34,992.00 Rehabilitative Maintenance Per Annum
(c) From December 1, 2014 - November 30, 2015: $2,500.00 Per Month = $30,000.00 Rehabilitative Maintenance Per Annum
(d) From December 1, 2015 - November 30, 2020: $2,200.00 Per Month = $26,400.00 Rehabilitative Maintenance Per Annum."
The foregoing constitutes the entirety of the agreement's maintenance provision. Critically, the agreement is silent regarding the effect, if any, of the wife's remarriage upon the husband's maintenance obligation. The agreement was subsequently incorporated, but not merged, into a judgment of divorce rendered by Supreme Court (Doyle, J.) in July 2008. The judgment includes a verbatim reproduction of the agreement's maintenance provision.
The wife remarried in December 2015. In April 2016, the husband emailed the wife to inform her that he would stop paying maintenance as a result of her remarriage. The husband's last maintenance payment was made that month.
The wife then moved to, inter alia, recover a monetary judgment for the amount outstanding and hold the husband in contempt for ending the maintenance payments. According to the wife, "a plain reading of . . . the agreement[] leads to only one conclusion: [the husband's] rehabilitative maintenance obligation survives [her] remarriage." That was so, the wife continued, because "[o]ther than November 30, 2020, no termination events are identified in the agreement. Since none can be implied and the Court cannot rewrite the parties' agreement, this Court must conclude [that the husband's] obligation to pay maintenance survives not only the wife's remarriage, but also her death and his death. The maintenance obligation ends on November 30, 2020 and no other time."
The husband opposed the wife's motion. Noting that the agreement contains no provision entitling the wife to continued maintenance payments upon her remarriage, the husband argued that the "fact that the parties did not expressly provide in the Agreement that maintenance payments would continue if [the wife] remarried establishes that the parties intended that [the husband's] obligation to pay [the wife] maintenance terminated upon her remarriage."
Supreme Court (Dollinger, A.J.) denied the wife's motion in its entirety. In a well-reasoned and thorough decision, the court held that, in light of the agreement's silence on the subject, the wife's remarriage ended the husband's obligation to pay maintenance. The wife now appeals.
DISCUSSION
The friction point here is easily stated: the wife says that the husband's maintenance obligations are unaffected by her remarriage; the husband says that his maintenance obligations do not extend beyond the wife's remarriage. For the reasons that follow, we agree with the husband.
I
A divorce settlement agreement is a contract, subject to standard principles of contract interpretation (see Rainbow v Swisher, 72 NY2d 106, 109 [1988]; Gurbacki v Gurbacki, 270 AD2d 807, 807-808 [4th Dept 2000]). The agreement at issue does not explicitly define the term "maintenance," and it is silent regarding the effect of the wife's remarriage upon the husband's maintenance obligation. Thus, the plain text of the agreement — which the Court of Appeals says is the best source of the parties' intent (see Goldman v White Plains Ctr. for Nursing Care, LLC, 11 NY3d 173, 176 [2008]) — is not conclusive of the question on appeal.
"Nevertheless, it is basic that, unless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein, for it is presumed that the parties had such law in contemplation when the contract was made and the contract will be construed in the light of such law" (Dolman v United States Trust Co. of N.Y., 2 NY2d 110, 116 [1956]; see Ronnen v Ajax Elec. Motor Corp., 88 NY2d 582, 589 [1996] [applying Dolman]). The Dolman rule is of longstanding vintage, and the "principle embraces alike those [laws in force at the time of a contract's execution] which affect its validity, construction, discharge, and enforcement" (Von Hoffman v City of Quincy, 71 US 535, 550 [1866] [emphasis added]). By virtue of the Dolman rule, when [*2]parties enter into an agreement authorized by or related to a particular statutory scheme, the courts will presume — absent something to the contrary — that the terms of the agreement are to be interpreted consistently with the corresponding statutory scheme (see e.g. Mayo v Royal Ins. Co. of Am., 242 AD2d 944, 945 [4th Dept 1997], lv dismissed 91 NY2d 887 [1998]; Matter of Andy Floors, Inc. [Tyler Constr. Corp.], 202 AD2d 938, 938-939 [3d Dept 1994]).
The statutory scheme corresponding to the agreement in this case is Domestic Relations Law § 236, which authorizes divorce settlement agreements and directs that such agreements specify the "amount and duration of maintenance," if any (§ 236 [B] [3] [3]). The term
" maintenance' " is defined within this statutory scheme as "payments provided for in a valid agreement between the parties or awarded by the court . . . , to be paid at fixed intervals for a definite or indefinite period of time" (§ 236 [B] [1] [a]). Critically, the statutory definition includes the following caveat: any maintenance award "shall terminate upon the death of either party or upon the payee's valid or invalid marriage" (id.). As thus defined, the concept of maintenance is unequivocally limited to payments made to an unmarried ex-spouse (see Matter of Howard v Janowski, 226 AD2d 1087, 1088 [4th Dept 1996]). And unless the parties contract otherwise, the Dolman rule incorporates this statutory limitation directly into a divorce settlement agreement "as though it were expressed or referred to therein" (2 NY2d at 116; see United States Trust Co. of N.Y. v New Jersey, 431 US 1, 19 n 17 [1977], reh denied 431 US 975 [1977]).
Thus, we categorically reject the wife's argument that the statutory definition of maintenance embodied in Domestic Relations Law § 236 (B) (1) (a) is irrelevant simply because the parties chose to settle the terms of their divorce in a written agreement. To the contrary, the statutory definition of maintenance supplies the interpretive context necessary to understanding the agreement as an integrated whole, and it provides the benchmark against which those contractual provisions are to be construed. In short, the statutory definition shines a beacon light of clarity unto a term that might otherwise be subject to varying interpretations.[FN1]
II
The default rule of construction supplied by the statutory definition of maintenance is merely that, however — a default rule. There are many reported instances in which parties to a divorce settlement agreement have varied the statutory definition of maintenance so that payments would continue beyond the remarriage of the payee (see e.g. Burn v Burn, 101 AD3d 488, 489 [1st Dept 2012]; Matter of DeAngelis v DeAngelis, 285 AD2d 593, 593-594 [2d Dept 2001]; Quaranta v Quaranta, 212 AD2d 683, 684 [2d Dept 1995]; Jung v Jung, 171 AD2d 993, 994 [3d Dept 1991]; Fredeen v Fredeen, 154 AD2d 908, 908 [4th Dept 1989]). In so doing, such parties effectively rebutted the presumption, embodied in the Dolman rule, that they intended to incorporate the corresponding statutory definitions into their agreement.
As the wife's appellate brief spills much ink in demonstrating, such a variance does not offend public policy (see Fredeen, 154 AD2d at 908). But the courts will not lightly infer the parties' intent to depart from the statutory definition of maintenance (see Scibetta v Scibetta-Galluzzo, 134 AD2d 823, 824 [4th Dept 1987]), and it is well established that mere silence will not do (see Quaranta, 212 AD2d at 684; Scibetta, 134 AD2d at 824; Jacobs v Patterson, 112 AD2d 402, 403 [2d Dept 1985]). Far from it — the parties' "intent to vary the statutory and precedential preference of an end to maintenance payments upon [remarriage] of [*3]the pay[ee] must be expressed clearly" (Matter of Riconda, 90 NY2d 733, 737 [1997] [emphasis added]), for compelling a person to support a remarried ex-spouse, "absent an agreement to the contrary," most assuredly does violate the public policy of this State (Jacobs v Patterson, 143 AD2d 397, 398 [2d Dept 1988]; see Scibetta, 134 AD2d at 824).[FN2]
The requisite degree of "clarity" in an agreement can be gleaned from the cases in which the parties successfully varied the statutory definition of maintenance. In Burn, for example, the First Department held that the wife's "waiver of a share of assets worth millions of dollars[] evinces the intent of the parties that the maintenance payments would continue until [her] death or the death of [the husband], regardless of [her] marital status" (101 AD3d at 489).
Quaranta is similar to Burn. There, the Second Department held that "the parties intended that the [wife] receive lifetime maintenance payments" because she "gave up her right to a distributive share of [certain valuable] property in exchange for maintenance payments[, which] the [husband] could deduct . . . for income tax purposes" (Quaranta, 212 AD2d at 684).
In DeAngelis, the divorce settlement agreement specified, "in detail," multiple events that would terminate the husband's maintenance obligations, but it did not include the wife's remarriage among them (285 AD2d at 593). Such an agreement, the Second Department held, established that the husband had "implicitly agreed to pay post-remarriage maintenance" (id. at 594).
In Jung, the Third Department held that the divorce settlement agreement "clearly evinces the intent of the parties that [the husband's] maintenance obligation would continue for a five-year period unconditioned on [the wife's] marital status," given the parties' multiple affirmative statements on the record that the agreement's maintenance-terminating events, which did not include remarriage, were exclusive and unconditional (171 AD2d at 994 [internal quotation marks and brackets omitted]).
And in Fredeen, we held that "the agreement clearly evinces the intent of the parties that [the husband's] maintenance obligation would continue until February 1991[] unconditioned on [the wife's] marital status," given the language in the agreement that such payments would continue past February 1991 unless, inter alia, the wife had remarried in the interim (154 AD2d at 908).
The wife points to nothing in this record that establishes the parties' intent to vary the statutory definition of maintenance with the clarity required by Riconda and demonstrated in Burn, DeAngelis, Quaranta, Jung, and Fredeen. The wife did not waive her right to any particular property distribution in exchange for a sum certain of maintenance (as the wife did in Burn and Quaranta); the agreement does not indicate that the wife's remarriage would preclude further maintenance payments after a certain date or under certain circumstances (as it did in Fredeen); the agreement does not set forth, in detail, various termination events while omitting remarriage from the list (as it did in DeAngelis); and there is no extrinsic evidence indicating that a remarriage clause was purposefully omitted from the agreement (as there was in Jung).[FN3]
III
Rather than attempting to establish, based on the unique facts of this case, that the parties intended to vary the statutory definition of maintenance, the wife contends that by setting the duration of maintenance, the parties necessarily varied the definition of maintenance to include payments after remarriage. We reject that contention [FN4].
The concept of "maintenance," as noted above, is explicitly limited by statute to payments made to an unmarried payee (see Domestic Relations Law § 236 [B] [1] [a]; Howard, 226 AD2d at 1088), and the Legislature explicitly invited parties to a divorce settlement agreement to fix the duration of "maintenance" as defined within the operative statutory universe, i.e., as payments that "shall terminate" upon the remarriage of the payee (§ 236 [B] [3] [3]; see generally McKinney's Cons Laws of NY, Book 1, Statutes § 236)[FN5]. It follows that, by setting the duration of "maintenance" in an agreement pursuant to Domestic Relations Law § 236, the parties are necessarily fixing the length of an obligation that continues in force only so long as the payee remains unmarried. If the parties wish to depart from that statutory definition, they must do so "clearly" (Riconda, 90 NY2d at 737), not simply by following the statutory directive to set the "duration" of a thing already defined. Any other construction would impermissibly frustrate the legislative definition of "maintenance." To the extent that our decision in Hancher v Hancher (31 AD3d 1152 [4th Dept 2006]) suggests a contrary rule, it should no longer be followed.
Indeed, the wife's proposed rule would mean that the Legislature initially defined the term "maintenance," yet then proceeded, within the same section of the Domestic Relations Law, to direct contracting parties to take an act — i.e., set the "duration" of "maintenance" in a settlement agreement — that would necessarily and fundamentally change the very definition that the Legislature had just adopted. In short, according to the wife, the Legislature simultaneously defined a term and set up a procedure that invariably negates a core feature of that definition in each and every case. Such a statutory scheme would be at war with itself, and we cannot countenance such a result.
The wife's argument overlooks the fact that, in practice, virtually every divorce settlement agreement will fix the duration of a maintenance award. Consequently, in the mine run of matrimonial dissolutions, the wife's proposed holding would effectively flip the statutory presumption: maintenance payments would presumptively survive the payee's remarriage, and [*4]the parties would need to take affirmative steps in the agreement to provide otherwise. But that is precisely the opposite of the Legislature's decree, and it is not for the courts to legislate in the guise of construction (see generally Matter of Tormey v LaGuardia, 278 NY 450, 451 [1938]).[FN6]
CONCLUSION
Unless the parties clearly provide otherwise in a divorce settlement agreement, the payor's obligation to pay maintenance ends upon the remarriage of the payee. Here, the relevant agreement is silent as to whether the husband's maintenance obligation survives the wife's remarriage. As a result, the husband's maintenance obligation terminated upon the wife's remarriage. Supreme Court therefore properly denied the wife's motion to, inter alia, hold the husband in contempt and recover the unpaid maintenance. Accordingly, the order appealed from should be affirmed.



Footnotes

Footnote 1: In Point I of her brief, the wife also argues that the summary maintenance-terminating procedure of Domestic Relations Law § 248 "do[es] not apply when the parties settle maintenance with a[n] opting out agreement." Perhaps so, but we need not definitively resolve that issue because the husband did not move to terminate maintenance under section 248, and the court did not direct such relief. To the contrary, as the wife recognizes elsewhere in her brief, this is a contract-interpretation case that requires us to construe the term "maintenance" in the agreement. Thus, although the substantive provisions of section 248 are arguably relevant to the public policy considerations of our interpretive inquiry, the summary procedure provided therein is not in play here.

Footnote 2: Although Riconda involved the other enumerated component of the definition of maintenance set forth in Domestic Relations Law § 236 (B) (1) (a) — namely, that payments continue only so long as both payor and payee are living — that distinct prong of the definition is equally variable by the parties upon the same "clear" expression of intent. Thus, as the Third Department has recognized, the cases that explicate the degree of clarity necessary to vary the still-living prong of the statutory definition of maintenance are equally instructive when determining whether or not the parties effectively varied the remarriage prong of the definition (see Sacks v Sacks, 168 AD2d 733, 734-735 [3d Dept 1990]).

Footnote 3: The other cases upon which the wife relies — Matter of Benny v Benny (199 AD2d 384 [2d Dept 1993]) and Gush v Gush (9 AD2d 815 [3d Dept 1959]) — are simply inapposite. The agreement in Benny was governed by California law (see 199 AD2d at 386-387), and the agreement in Gush — which was executed before the advent of equitable distribution — stated that the husband's alimony obligation was to be " absolute, unconditional and irrevocable' " (9 AD2d at 815).

Footnote 4: Given the many statutory and policy differences between maintenance and child support, the agreement's child support provisions do not logically inform the proper interpretation of the maintenance provisions, nor do the child support provisions assist in answering the discrete question posed by this appeal, i.e., whether the parties clearly varied the statutory definition of maintenance by providing for continued payments after the wife's remarriage.

Footnote 5: Statutes § 236, as distinct from Domestic Relations Law
§ 236, provides that, "[i]n the absence of anything in the statute indicating an intention to the contrary, where the same word [here, maintenance,'] is used in different parts of a statute, it will be presumed to be used in the same sense throughout." Thus, the term "maintenance" means the same thing in Domestic Relations Law § 236 (B) (3) (3) as it does in Domestic Relations Law § 236 (B) (1) (a).

Footnote 6: It is true, as the wife argues at great length, that parties to a divorce settlement agreement need not explicitly modify the statutory definition of maintenance in order to do so effectively. No one suggests otherwise. But the mere fact that the statutory definition of maintenance could be varied implicitly does not, as the wife argues, relieve contracting parties of the obligation to express that variance clearly.
Entered: July 25, 2018
Mark W. Bennett
Clerk of the Court